**AMERICAN TRADING AND PRODUCTION CORPORATION, a Maryland corporation,**

v.

**UNITED STATES of America.**

Admiralty No. 3952.

United States District Court
D. Maryland.

April 8, 1959.

Harrison M. Robertson, Jr., Cable & McDaniel, Baltimore, Md., for libelant.

Leon H. A. Pierson, U. S. Atty., Baltimore, Md., and Lawrence F. Ledebur, Atty., Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., for respondent.

THOMSEN, Chief Judge.

Libelant claims that the government improperly interfered with libelant's performance of a contract (charter party) which it had with the government.

The parties have stipulated some facts and have stipulated that certain persons, if present, would testify to other facts. The decision depends on inferences and conclusions to be drawn from those facts.

The United States, acting through its Military Sea Transportation Service

(MSTS) entered into a Master Tanker Voyage Charter Party with libelant, owner and operator of the S. S. American Trader, which contemplated the negotiation of specific voyage charters and contained provisions governing such voyages. Pursuant to that agreement, the parties executed a Tanker Voyage Charter Party and a "fixture letter", to cover a voyage of the American Trader from loading ports in the Persian Gulf to discharging ports in the Far East. The Commander, MSTS, Washington, first designated Sasebo, Japan, as the port of discharge, but on September 14, 1955, while the vessel was en route to Sasebo, the Commander, MSTS, Washington, requested that the vessel be diverted to Inchon, Korea, for discharging, and libelant radioed the master, ordering him to divert the vessel to Inchon. Any additional charge for that diversion from Sasebo to Inchon has been paid and is not involved in the present suit.

On September 16 the master gave the Navy his estimated time of arrival (ETA) at Inchon as September 19 at 0500.[1] The Navy is in charge of the operation of chartered vessels, but the Army arranges for unloading and berthing the vessels and for the storage of petroleum products. Only the Commander, MSTS, Washington, had authority to modify the contract by ordering a diversion of the chartered vessels.

At 0945 on Sunday, September 18, Captain MacLean, duty officer at the Japan Quartermaster Petroleum Depot (JQMPD), notified the Overseas Tanker Branch, United States Army Post in Japan (OTB), that the American Trader, due to engine trouble, had been diverted from Inchon and would arrive in Yoko-

hama the night of September 18 or the morning of September 19. It was the duty of OTB to procure pilots and tugs and to conduct cargo operations on tank vessels in the Tokyo Bay area. Therefore, at 1000 on September 18 Neil Ryan, Marine Superintendent of OTB, telephoned the Yokohama office of libelant's port agent in the Far East (Sugarcraft) and asked if they had an ETA for the vessel at Yokohama. George Budge, the man on duty that Sunday, replied that he had no ETA because the vessel was not expected to call at Yokohama. Ryan then relayed to Budge the information he had obtained from MacLean and requested Budge to call OTB if Sugarcraft later received an ETA at Yokohama. Shortly thereafter MacLean or some one else at JQMPD notified Ryan that the vessel was not encountering engine trouble but was coming to Yokosuka—about 18 miles from Yokohama—for full discharge because of trouble with the submarine pipe lines at Inchon. Ryan relayed this information to Budge and left instructions with the OTB personnel for handling the vessel if and when an ETA was received. MacLean cannot now recall the source of the information which he gave to OTB. I find as a fact that there had been no engine trouble on the American Trader. It is not clear whether there was in fact some trouble with the submarine pipe lines at Inchon or merely a false report of such trouble which had come to Mac-Lean's attention.[2] Ryan had no authority to request or order any diversion of the vessel, and did not do so.

At about 1100 on September 18 Budge received a telephone call from the duty NCO of the MSTS Tanker Section at Yokohama advising that the vessel was

---

1. All times have been converted to Zone time, i. e. local time in Japan and South Korea.

2. To compound the confusion, the telephone log book of OTB Yokohama for September 18 contains the following notations:

"0945—McLain (Capt.) called—said American Trader on its way to Hakozaki—was on way to Korea but de-

veloped engine trouble—will be here late this afternoon or early tomorrow."

"1215—Capt. McLain called—American Trader continuing to Inchon, will not come here."

There is no indication that the second message was ever communicated by Mac-Lean or any one else at OTB either to MSTS or to Sugarcraft.

proceeding to Yokosuka for full cargo discharge and that the vessel was to berth at Azuma. There is nothing to show how, when or from whom the NCO got this information. He had no authority to order a diversion; his duties were confined to liaison with the Army and with vessel agents to obtain ETAs. About 1130 Budge called the MSTS office in Yokosuka for confirmation of the report that the vessel was coming to Japan. The duty officer at MSTS Yokosuka was reported out for lunch, and Budge asked that he return the call. He did not call, although Budge waited at the office until 1800 on September 18. Nor did Budge call MSTS again that day. However, at about 1400 Budge sent the following radio message to the master of the American Trader:

"MSTS Diverted Vessel Yokosuka Berthing Asuma Portside To The Dock Stop Advise ETA Yokosuka Breakwater
Sugarcraft"

The vessel promptly turned toward Yokosuka. On Monday, September 19, 1955, Sugarcraft requested MSTS Yokohama to give written confirmation of the alleged diversion, but was advised that no one in MSTS had requested a diversion of the vessel from Inchon to Japan. No message had been received by the Navy from the vessel concerning any engine trouble, nor had the Navy sent any messages to the vessel, her owners or agents, advising her to divert because of a breakdown of the Inchon pipe line or for any other reason. On the contrary, MSTS advised Sugarcraft that the vessel still was required at Inchon. It is not clear at what time on September 19 MSTS gave this information to Budge. At 1451 that day Budge sent the following radio message to the master of the vessel:

"Maintain Radio Alert Possible Rediversion To Inchon As Military Here In Controversy Stop Advise If You Received Any Diversion Orders Yokosuka Other Our Message Of Eighteenth Stop * * * Will

Radio You Soon As Possible Meantime Request Your Urgent Reply.
Sugarcraft"

At 1728 the vessel replied that the only diversion instructions received by it were those of September 18 dispatched by Sugarcraft. At 1810 Sugarcraft sent the following radio message to the master:

"Military Here Now Advises Submarine Pipelines Inchon Now Repaired And Absolutely Require Your Cargo There Stop Necessary You Proceed Inchon * * *
Sugarcraft"

This message was received by the master at 1850 and he promptly turned back toward Inchon.

The parties agree that libelant's expenses for the diversion toward Japan total $5,988.80.

Discussion.

Libelant now concedes that no diversion of the vessel was ordered by the government. It contends that the messages and requests for ETAs given to Budge by the Army (Ryan, OTB) and by the Navy (the NCO at MSTS Yokohama), justified Budge in believing that a diversion had been ordered for emergency reasons.

■ The government concedes that there is "an implied provision of every contract, whether it be one between individuals or between an individual and the Government, that neither party to the contract will do anything to prevent performance thereof by the other party or that will hinder or delay him in its performance." George A. Fuller Co. v. United States, 69 F.Supp. 409, at page 411, 108 Ct.Cl. 70. See also Williston on Contracts, Rev.Ed., sec. 1293–A. The government contends that Budge should not have sent the radio message to the master which he sent at 1400 on September 18 without checking further to determine whether a diversion order had in fact been given by someone with authority.

In Peter Kiewit Sons' Co. v. United States, 151 F.Supp. 726, 138 Ct.Cl. 668, the court held that: " * * * where

the Government or its authorized representatives are guilty of some act of negligence or willful misconduct which delays the contractor's performance, the Government is liable for the resulting damages, Chalender v. United States, 119 F. Supp. 186, 127 Ct.Cl. 557. This is so because there is in every Government contract, as in all contracts, an implied obligation on the part of the Government not to willfully or negligently interfere with the contractor in the performance of his contract, Chalender, supra; George A. Fuller Co. v. United States, 69 F.Supp. 409, 108 Ct.Cl. 70. * * * " 151 F. Supp 726, at page 731. Corbin on Contracts, sec. 947, p. 814, says: "* * * it is practically immaterial whether the implied promise is a fiction of the court to attain a desirable result or is a justifiable inference of fact. In some cases the wrongful conduct could have been treated as a tort; and it can still be so treated if the courts find it of advantage in the course of justice. Even so, it can be made use of both for defense and for attack, in contract actions."

■ It is fortunate that the results of this comedy of errors played out in the Pacific theatre on a Sunday morning were not serious. The confusion started with the two false reports transmitted from one Army Post (JQMPD) to another (OTB) and relayed by the latter to libelant's agent. OTB told Budge that the American Trader was coming to Japan for discharge because of trouble with the submarine pipe lines at Inchon, and asked Budge for an ETA. The Navy NCO was even more explicit as to the berthing and the new port of discharge and also requested an ETA. It is not clear whether there was in fact any trouble with the pipe line at Inchon, but since the government told Budge that the vessel had been diverted for that reason, he was justified in believing that a valid diversion order had been given. He attempted to verify this through the office of MSTS at Yokosuka without avail, and the duty officer there did not return his call. Perhaps it would have been more prudent for Budge to have sent a radio

message to the master of the American Trader inquiring whether he had received a diversion order, but Budge was being pressed by both the Army and the Navy for an ETA, and the radio message which he did send indicates that he believed what he had been told by the representatives of both services. The master would naturally assume that he had failed to receive the direct order, or that the order was being transmitted to him through the agent. In any event, the government could have cleared up the matter at any time during the afternoon of September 18 or the morning of September 19 by the exercise of a modest amount of care, let alone reasonable care. OTB did nothing about the message which it received from "McLain" at 1245 (see note 2); the duty officer at Yokosuka did nothing; and it is the reasonable inference from Budge's two radio messages of September 19 that the services did not clear up the confusion created by the false reports until the afternoon of September 19.

Libelant is entitled to recover the agreed damages of $5,988.80. Counsel will prepare an appropriate decree.