UNITED STATES of America, Plaintiff,

v.

BEDFORD ASSOCIATES, a Partnership, Doris K. Carver and Samuel Ades, individually and as partners of Bedford Associates, and Amcar Management Corp., Defendants,

and

The Bowery Savings Bank, Intervenor.

The BOWERY SAVINGS BANK, Plaintiff,

v.

BEDFORD ASSOCIATES, a Partnership, Doris K. Carver and Samuel Ades, individually and as partners of Bedford Associates, and United States of America, Defendants.

Nos. 79 Civ. 1522 (HFW), 79 Civ. 1482 (HFW).

United States District Court, S. D. New York.

July 7, 1982.

1767, 72 L.Ed.2d 173 (1982). Reader familiarity with the opinions is assumed.

These actions presently are before the court following remand from the United States Court of Appeals for the Second Circuit for trial of the government's claim for damages arising from Bedford's breach of a lease of the premises. Also before the Court are (1) the government's condemnation of a leasehold interest in the entire premises at 120 Church Street pursuant to 28 U.S.C. § 2409a; and (2) Bowery's action for foreclosure of its consolidated first mortgage on the premises and a sale of the premises pursuant to the judgment of this court dated June 9, 1980.

John S. Martin, Jr., U. S. Atty., S.D.N.Y., New York City, for the U. S.; William J. Brennan, Harvey J. Wolkoff, Asst. U. S. Attys., New York City, of counsel.

Rosenman, Colin, Freund, Lewis & Cohen, New York City, for Bedford; Frank H. Wohl, Douglas N. Gordon, Eugene A. Gaer, Douglas J. Clubok, New York City, of counsel.

Cadwalader, Wickersham & Taft, New York City, for the Bowery; Terence F. Gilheany, Howard R. Hawkins, Jr., John F. Mariani, New York City, of counsel.

## OPINION

WERKER, District Judge.

These consolidated cases involve the adjudication of the rights and liabilities of Bedford Associates as owner-mortgagor, The Bowery Savings Bank as mortgagee, and the United States government as tenant of the 21 story office building located at 120 Church Street, in New York City. The background of these cases is contained in the prior opinions of this court and the Court of Appeals for the Second Circuit. *United States v. Bedford Associates,* 618 F.2d 904 (2d Cir. 1980), *on remand,* 491 F.Supp. 848 (S.D.N.Y.1980) and 491 F.Supp. 851 (S.D.N.Y.1980), *aff'd in part, rev'd in part and remanded,* 657 F.2d 1300 (2d Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct.

## THE GOVERNMENT'S ACTION FOR DAMAGES

In its second amended complaint, the government sought damages for Bedford's failure to alter the premises, to perform certain obligations with respect to the provision of electrical and other services to the premises, and to provide free and uninterrupted possession, use and enjoyment of the premises to the United States. The government seeks recovery for both past and prospective damages.

## PAST DAMAGES

First, the government seeks to recover from Bowery as assignee of Bedford's right to receive rents under the lease all payments made to Bowery in excess of the rent and utilities payments due to Bedford under the terms of the lease. As the rent that the government was required to pay under the judgment of this court dated June 9, 1980 was modified as of October 1981 to reflect the rent due under the lease agreement as found by the Court of Appeals, at issue here is the recovery of overpayments of rent made by the government between November 1978 and September 1981. With respect to utilities payments, the government seeks to recover all utilities payments except for amounts allocated to "special equipment" and "overtime" between November 1978 and November 1981.

The government relies primarily on section 74 of the *Restatement of Restitution* (1937) which provides:

A person who has conferred a benefit upon another in compliance with a judgment, or whose property has been taken thereunder, is entitled to restitution if the judgment is reversed or set aside, unless restitution would be inequitable or the parties contract that payment is to be final; if the judgment is modified, there is a right to restitution of the excess.

▇▇▇ An award of restitution is not a matter of right but rests in the sound discretion of the court. *Atlantic Coast Line v. Florida,* 295 U.S. 301, 310, 55 S.Ct. 713, 717, 79 L.Ed. 1451 (1935). "The court will not order it where the justice of the case does not call for it or where the retention is not shown to be contrary to equity and good conscience." *Id.; see Rae v. Rosenberg,* 67 Misc.2d 881, 324 N.Y.S.2d 898 (Sup.Ct. Kings County 1971). As discussed by Mr. Justice Cardozo in *Atlantic Coastline v. Florida:*

Decisions of this court have given recognition to the rule as one of general application that what has been lost to a litigant under the compulsion of a judgment shall be restored thereafter, in the event of a reversal, by the litigants opposed to him, the beneficiaries of the error. . . . But the rule, even though general in its application, is not without exceptions. A cause of action for restitution is a type of the broader cause of action for money had and received, a remedy which is equitable in origin and function. The claimant to prevail must show that the money was received in such circumstances that the possessor will give offense to equity and good conscience if permitted to retain it. The question no longer is whether the law would put him in possession of the money if the transaction were a new one. The question is whether the law will take it out of his possession after he has been able to collect it.

*Atlantic Coastline v. Florida,* 295 U.S. at 309–10, 55 S.Ct. at 716–17.

From the foregoing, it is plain that only a party who obtained a benefit to which he was not entitled may be required to make restitution of funds paid under a judgment that ultimately is reversed. Bowery, however, has applied all rents received to pay existing debts of Bedford and to maintain the premises.[1] Having received only that to which it was entitled under the terms of Bedford's mortgage, it is evident that Bowery did not benefit unjustly from the government's overpayments. *See Equilease Corp. v. Hentz,* 634 F.2d 850, 853 (5th Cir. 1981); *see generally Lowenstein v. Reikes,* 258 N.Y. 444, 180 N.E. 113 (1932); *Millfield Realty Co. v. Joseph P. Day, Inc.,* 257 N.Y. 515, 178 N.E. 775 (1931); *Youmans v. Edgerton,* 91 N.Y. 403 (1883). Under these circumstances, it would be "patently unfair" to require Bowery which stands in the position of "an innocent payee who has received and used the money to satisfy a debt," to repay the money. *Equilease Corp. v. Hentz,* 634 F.2d at 853.

Bedford, on the other hand, did receive the benefit of satisfaction of pre-existing debts as a result of the government's overpayments. Consequently, it is Bedford and not Bowery that may be required to make restitution to the government. *See Eightway Corp. v. V. Ponte & Sons, Inc.,* 99 Misc.2d 989, 420 N.Y.S.2d 836 (App. T. 2d Dep't 1979).

▇▇▇ The next issue that must be determined is the amount of rent that the government was required to pay during renovations. The Court of Appeals held that the term concerning rent during renovations was fixed as that set forth in Bedford's November 1977 proposal, but required that this court consider on remand whether GSA's delay in securing congressional approval of the lease constituted a lack of cooperation sufficient to excuse

---

1. During the period from June 1980 through November 1, 1981, Bowery collected $6,242,-261.31 in rent pursuant to the above order. It paid $1,047,218.36 in operating costs, $2,145,- 486.69 in real estate taxes, water and sewer charges, and $3,215,091.28 to reduce interest due on Bedford's debt under the mortgage. Bowery's Proposed Finding of Fact Nos. 1 & 2.

Bedford from its obligation to renovate the premises within the period set forth in the lease.

It is the judgment of this court that Bedford was excused from any duty to renovate the premises by GSA's dilatory behavior in procuring the necessary approvals for the proposed lease. My conclusion is based on the well-settled principle that where one of the parties to a contract makes performance by the other materially more difficult or expensive, the latter will be discharged. 6 Corbin, *Contracts* § 1323 at 334 (1964); *see United States v. Peck,* 102 U.S. 64, 26 L.Ed. 46 (1880); *Shear v. National Rifle Association of America,* 196 D.C.App. 344, 606 F.2d 1251, 1255 (1979); *Vanadium Corp. of America v. Fidelity & Deposit Co. of Maryland,* 159 F.2d 105 (2d Cir. 1947); *American Trading & Production Corp. v. United States,* 172 F.Supp. 165 (D.Md.1959); *George A. Fuller Co. v. United States,* 108 Ct.Cl. 70, 69 F.Supp. 409 (1947); 11 *Williston on Contracts* § 1296 pp. 56–59 (3d ed. 1968 & Supp. 1981). In this case, there is no dispute that GSA's delay caused the commencement of renovations to be postponed until a time when construction costs had skyrocketed and performance would have been economically devastating to Bedford. 491 F.Supp. at 856, 864. Thus, the rent which should have been paid by the government was $241,846.66 per month from the date of commencement of the lease, November 1, 1978.

■ The Court of Appeals found that "Bowery *was* entitled to receive only the rental specified by the lease agreement" and that the June 9, 1980 judgment of this court should be modified accordingly. *Id.* at 1318 (emphasis added). In my opinion, this language contemplates restitution of overpayments made by the government pursuant to this court's June 9, 1980 judgment. In the exercise of this court's equitable powers, however, I find that restitution to the government of rental overpayments must be offset by any and all deficiencies in the monthly rental payments made by the government between November 1978 and May 1980.

■ The next issue is whether the government is entitled to restitution from Bedford of all overpayments of utilities from November 1978 to November 1981 except those made for "special equipment" and "overtime." On March 5, 1980, the Court of Appeals affirmed this court's decision requiring the government to pay all utilities expenses at 120 Church Street as a condition to the granting of a preliminary injunction in favor of the government, but modified prospectively the amount to be paid to $14,000 per month. Since the payment of utilities was required as a condition of granting to the government the equitable relief of specific performance of the lease *pendente lite, see United States v. Bedford Associates,* 618 F.2d 904, 916 (S.D. N.Y.1980), the government is not entitled to restitution of amounts paid for utilities prior to the date of judgment. As observed by the Court of Appeals:

> If the District Court is free to exercise the typical powers of a court of equity, it has the power to impose conditions requiring maintenance of the *status quo.* Conditions of this nature traditionally may be made the price of relief when the injunctive powers of the court are invoked and the conditions are necessary to do justice between the parties . . . .

*United States v. Bedford Associates,* 618 F.2d 904, 917 (S.D.N.Y.1980). Accordingly, the government is entitled to restitution of overpayments for utilities only for the period from June 1980 to November 1981.

The next issue that must be determined is the amount that was to be paid by the government for utilities under the terms of the lease. Under the lease agreement, the government was entitled to all lighting, whenever used. The government, however, was obligated to pay for all "over-time" usage which was defined in the lease as all air-conditioning and heating that it requested beyond the hours of 8:00 a. m. to 6:00 p. m. Monday through Friday. Hearing Exs. 12–25, 29, 38 (A. 744, 794–830, 834, 850–964). In addition, the government was responsible for the cost of electricity consumed by special equipment in the premis-

es, such as photocopying machines and computers. *Id.*

The government's cost for electricity consumed by all equipment at the premises, including special equipment, is approximately $58,200.00 per year. The Internal Revenue Service did not incur any "overtime" for air-conditioning or heating in 1980 until December 28, 1980. Between December 28, 1980 and September 30, 1981, however, the IRS incurred $4,160.00 for overtime services. G. Exs. 566, 567; Tr. at 122, 131–32, 234–36.

Thus, the government is entitled to restitution from Bedford of utilities payments made between June 1980 and November 1981 in excess of the $4,160.00 for overtime services and the proportionate special equipment costs attributable to the period June 1980 to November 1981 based on an annual cost of $58,200.00 per year.

In accordance with the above, the government is entitled to restitution from Bedford of (1) $1,141,476.10 in rental payments and (2) $1,054,302.84 in utilities payments.

## SQUARE FOOTAGE

The government's solicitation called for offers of 317,000 net usable square feet, plus an option on an additional 8,000 net usable square feet. The method for computing net usable square feet was set forth in the solicitation. A. 788. It required deductions for certain areas of the building which normally would not be deducted in an ordinary commercial leasing situation. *See* pp. 742–743, *infra.*

> Although Bedford and GSA were substantially in agreement as to the measurements of the building, they did not agree as to the square footage to be rented because of their disagreement as to the applicability of the corridor deduction factor. The issue of the applicability of the corridor deduction factor was never resolved....

*United States v. Bedford Associates,* 491 F.Supp. at 863. This disagreement was held by the Court of Appeals to be insignificant and not of a nature that would preclude enforcement of the agreement, *Unit-*

*ed States v. Bedford Associates,* 657 F.2d at 1311, since under the terms of the agreement, the "dispositive measurement of the leased space was to be a mutual field measurement after delivery of the space [with] any disagreement [being] resolved through administrative proceedings." *Id.* at 1310.

The parties' disagreement with respect to the net usable square footage of 120 Church Street was based on the disparity in measurement arising from Bedford's position that the corridor deduction factor did not apply to open landscaping and the government's contention that it did. Thus, the only question that must be resolved is whether the corridor deduction factor applies to open landscaping.

■ Two Board of Contract Appeals decisions have found that the corridor deduction factor which requires that "if the corridor system ... does not provide ready access to *all* rooms required, a deduction for corridors will be made in an amount equal to 10% of the gross area" after certain deductions, applies to offices with open landscaping if even one room lacks access to a corridor. *Appeal of Grubbs & Ellis Development Co.,* Board of Contract Appeals Decisions 76–2 § 12,189 (1976); *Appeal of Third and Pierce, Inc.,* Board of Contract Appeals Decisions 74–1 ¶ 10,452 (1974). Although the government's blanket statement that the Board of Contract Appeals has held that the 10% deduction factor applies to open landscaping appears to be incorrect, there is sufficient evidence in this case to infer that even with "open landscaping," 120 Church Street would not provide ready access to all rooms required. Appraisal of James Peel at 28–29; *see Appeal of Grubbs & Ellis Development Co.,* Board of Contract Appeals Decisions 76–2 § 12,189 (1976). The parties having agreed to resolve any disputes with respect to net usable square footage of the building through administrative proceedings and the interpretation of the 10% corridor deduction factor by the Board of Contract Appeals being well-settled, Bedford is bound by that interpretation. Accordingly, the 10% corridor deduc-

tion factor must be applied in computing the net usable square feet of 120 Church Street for a total of 325,000 square feet rather than 341,151 square feet.

## PROSPECTIVE DAMAGES

■ The government seeks prospective damages in the nature of loss of the benefit of the bargain of a long-term lease agreement measured by the difference between the rent it would have paid under the lease and the rent it will have to pay under the leasehold interest it has elected to condemn in the premises multiplied by the number of years the lease was to run. The government also seeks consequential damages arising from the effect of Bedford's breach on the IRS's operations and for the cost of furnishing services and utilities to the premises comparable to the services and utilities that Bedford was obligated to provide under the lease. It further seeks to recover for the fair market value of the construction costs for alterations which Bedford was responsible for under the lease agreement.

Bedford has been found to have been excused from its contractual obligation to renovate the premises as a result of GSA's delay in securing congressional approval of the lease. *See* pp. 736–737, *supra.* Accordingly, the government is not entitled to damages for Bedford's failure to renovate the premises.

■ The government asserts that it is entitled to general contract damages for Bedford's breach of the lease in this case. According to the government, the proper measure of damages in breach of contract cases is "the amount necessary to put the injured party in [the] exact position as he would have been if the contract had not been breached." *Perma Research & Development v. Singer Co.,* 542 F.2d 111, 116 (2d Cir.), *cert. denied,* 429 U.S. 987, 97 S.Ct. 507, 50 L.Ed.2d 598 (1976).

The government's contention that its damages should be measured in the same manner as in an ordinary breach of contract action must be rejected. The particular contract at issue in this case was found to be a valid lease. Consequently, the government's damages must be assessed in accordance with the body of law applicable to breaches of the covenants of a lease.

The government has asserted two theories in support of its claim for prospective damages for Bedford's breach of the lease.

In support of its argument that it is entitled to "benefit of the bargain" damages, the government relies on the following principle:

> Where an owner of real property refuses to execute a lease in accordance with a prior agreement, the general rule is that the measure of damage recoverable is the difference between the agreed rent and the rental value of the premises, multiplied by the number of years the lease has to run.

1 Rasch, *New York Landlord and Tenant* § 58 at 77 (2d ed. 1971).

The government's reliance on this principle is misplaced. The textual paragraph preceding that quoted above makes clear that this measure of damages applies only to a breach of contract to enter into a lease where "a valid, binding agreement for a lease exists." *Id.* In this case, the Court of Appeals did not find that Bedford was in breach of a contract to enter into a lease. Rather, the court found that Bedford had breached a valid lease, and remanded for a determination of the "government's claim for damages under the lease."[2] *United States v. Bedford Associates,* 657 F.2d at 1308, 1317. Consequently, the government has not established its entitlement to benefit of the bargain damages.

Even if the government were entitled to benefit of the bargain damages measured by the difference between the rent it would have paid under the lease and the rental

---

**2.** Bedford's various arguments in support of its contention that there was no breach of the lease and its contention that the government must resort to administrative procedures for breach of the lease are meritless. Bedford was found to have breached the lease and this action was remanded for trial of the government's claim for damages.

value of the premises, multiplied by the number of years the lease was to run, those damages would be nominal.

The rental value of the premises must be determined at the time of the breach. *Mullins v. Brown,* 87 Ohio App. 427, 431, 94 N.E.2d 574, 578 (Ct.App.1950); *see Simon v. Electrospace Corp.,* 28 N.Y.2d 136, 145, 269 N.E.2d 21, 26, 320 N.Y.S.2d 225, 232 (1971); *Orange & Rockland Utilities, Inc. v. New England Petroleum Corp.,* 60 App.Div.2d 233, 400 N.Y.S.2d 79 (1st Dep't 1977); *Hayden v. Pinchot,* 172 App. Div. 102, 158 N.Y.S. 215 (1st Dep't 1916); *Howells v. Albert,* 37 Misc.2d 856, 236 N.Y. S.2d 654 (Sup.Ct. Nassau County 1962). The breach must be deemed to have occurred when Bedford failed to execute the new lease on December 13, 1978. Proposed Post-Trial Findings of Fact of United States of America No. 2.

The government has introduced no evidence of what the rental value of the premises was on December 13, 1978. Since there is no evidence of the rental value of the property as of December 13, 1978 and it is unlikely that the rental value of the premises on December 13, 1978 had changed significantly from its value on November 1, 1978, the government is bound by the value it asserted for the property as of November 1, 1978.

On numerous occasions, the government argued before this court that the fair market rental value of the premises as of November 1, 1978 was the rent set forth in the proposed lease. *See, e.g.,* United States' Answers to Bedford's First Set of Interrogatories, No. 12; United States Proposed Post-Trial Findings of Fact 63, 64 (1980 Trial). In my opinion, the government is now estopped from changing its position and arguing that the fair market rental of the leasehold was higher on that date. The principle embodied in such a holding is that of "judicial estoppel 'or preclusion against inconsistent position, [which] is designed to protect the integrity of the courts and the judicial process.'" *United Virginia Bank v. B.F. Saul Real Estate,* 641 F.2d 185 (4th Cir. 1981); *see*

*Ronson Corp. v. Liquifin Aktiengesellschaft Liquigas, S.P.A.,* 375 F.Supp. 628 (S.D.N.Y. 1974). As there was no difference between the asserted rental value of the premises for the term of the lease and the agreed rent as of December 13, 1978, the government's "benefit of the bargain" damages would be zero and it would be entitled to an award of nominal damages only.

The only other theory under which the government advances its claim for prospective damages is a breach by Bedford of the covenant of quiet enjoyment.

There is an implied covenant of quiet enjoyment in every lease. 2 Rasch, *New York Landlord and Tenant* § 891 (2d ed. 1971). The covenant is implied in the landlord-tenant relationship even where the tenant is in possession only as a hold-over. *See Transit Drive-In Theater, Inc., v. Outdoor Theatre Caterers, Inc.,* 53 App.Div.2d 1009, 386 N.Y.S.2d 482 (4th Dep't 1976); *Restatement (Second) of Property* § 14.7 & comment e (1976); 1 Rasch, *New York Landlord & Tenant* § 275 at 360 (2d ed. 1971). Generally, "an eviction, actual or constructive, is necessary to constitute a breach of a covenant for quiet enjoyment." *Id.* § 893. *See Dave Herstein Co. v. Columbia Pictures Corp.,* 4 N.Y.2d 117, 149 N.E.2d 328, 172 N.Y.S.2d 808 (1958); *Sears, Roebuck & Co. v. 9 Avenue—31 Street Corp.,* 274 N.Y. 388, 398, 9 N.E.2d 20, 25 (1937); *Leider v. 80 William St. Co.,* 22 App.Div.2d 952, 255 N.Y.S.2d 999 (1964).

There has been no actual eviction in this case for the government was not physically excluded from occupancy of 120 Church Street by any act of Bedford. *See Barash v. Pennsylvania Terminal Real Estate Corp.,* 26 N.Y.2d 77, 256 N.E.2d 707, 308 N.Y.S.2d 649 (1970). Although Bedford threatened to close the building and terminate services at 120 Church Street as of March 23, 1979, this action never occurred and the mere assertion of a paramount title is not an eviction. *Restatement (Second) of Property* § 4.3 & comment c (1976); *see id.* 308 N.Y.S.2d at 652–54, 256 N.E.2d at 709–10. Similarly, although Bowery commenced

an action to foreclose Bedford's mortgage, neither the commencement of this action nor the judgment of foreclosure entered in this case gave rise to a breach of the covenant of quiet enjoyment. It is well-settled that it is not until the lessee is ousted from occupancy by the purchaser at the foreclosure sale that the lessor breaches the covenant of quiet enjoyment. *See Metropolitan Life Insurance Co. v. Childs Co.,* 230 N.Y. 285, 130 N.E. 295 (1921); 2 Rasch, *New York Landlord and Tenant* § 961 (2d ed. 1971); *Restatement (Second) of Property* § 4.3 & comment d (1976). The case of *Ganz v. Clark,* 252 N.Y. 92, 169 N.E. 100 (1929), relied on by the government is not to the contrary for in that case, the lessee actually was evicted following foreclosure of the mortgage. Finally, condemnation by the government of an interest in the premises does not give rise to a breach of the covenant of quiet enjoyment, for the "covenant goes only to the lessor's title, and does not warrant against those fundamental liabilities to action on the part of the sovereign power which lie behind all private titles." *Dolman v. United States Trust Co. of New York,* 2 N.Y.2d 110, 114, 138 N.E.2d 784, 786, 157 N.Y.S.2d 537, 540 (1956); *see Restatement (Second) of Property* § 8.1 (1976); 2 Rasch, *New York Landlord and Tenant* § 971 (2d ed. 1971).

Even though there was no actual eviction, it nevertheless must be determined whether there was a constructive eviction of the government in this case.

> Constructive eviction exists where, although there has been no physical expulsion or exclusion of the tenant, the landlord's wrongful acts substantially and materially deprive the tenant of the beneficial use and enjoyment of the premises. The tenant, however, must abandon possession in order to claim that there was a constructive eviction.

*Barash v. Pennsylvania Terminal Real Estate Corp.,* 26 N.Y.2d 77, 83, 256 N.E.2d 707, 710, 308 N.Y.S.2d 649, 650 (1970).

In my opinion, there was no constructive eviction in this case. Bedford's refusal to accept the government as tenant under the terms of the new lease did not substantially and materially deprive the government of the beneficial use and enjoyment of the premises. In addition, the government at no time abandoned the premises.

Even if Bedford's action of refusing to accept the government as a tenant under the new lease on December 13, 1978 constituted a constructive eviction and the government was not required to abandon the premises because of the need to avoid interference with government operations, *see United States v. Bedford Associates,* 657 F.2d at 1318, the government's damages would be nominal. Under the rule set forth in *Sears, Roebuck & Co. v. 9 Avenue—31 Street Corp.,* 274 N.Y. 388, 9 N.E.2d 20 (1937), in the absence of fraud or other fault of the landlord, a tenant who has not paid rent in advance may recover only nominal damages for a breach of the covenant of quiet enjoyment.

It has already been determined that Bedford at all times acted in good faith in its relations with the government. *United States v. Bedford Associates,* 491 F.Supp. at 863. This finding was left undisturbed on appeal. Any suggestion that Bedford acted fraudulently or with other intentional fault at any time during the course of its dealings with the government is unsupportable. Thus, the only ground for arguing that the breach of the covenant was the result of some fault on the part of Bedford is that it took an untenable legal position in refusing to acknowledge the existence of a valid lease. In my opinion, however, Bedford's mistaken view that there was no valid lease does not amount to fault as that term is used in the *Sears, Roebuck* case.

The decision which held that the lease existed in this case was not based on traditional concepts of contract law but on novel propositions of federal law. *See United States v. Bedford Associates,* 657 F.2d at 1309–1310, 1309 n.7; *id.* at 1319 (Moore, J. dissenting). Although the Court of Appeals found that Bedford was charge-

able with knowledge of the special law applicable to government leases, *United States v. Bedford Associates,* 657 F.2d at 1309, 1309 n.6, it is apparent that not even GSA personnel involved in the programming, planning and development of procedures for GSA's nationwide leasing program were aware that negotiations could not continue once a prospectus was submitted to Congress for approval. Affid. of Richard Gaskins, sworn to 12/17/81 at ¶¶ 8–10. Under these circumstances, I conclude that the breach of the covenant of quiet enjoyment was not the result of any fault, intentional or otherwise, of Bedford. Accordingly, under the rule set forth in *Sears, Roebuck & Co. v. 9 Avenue—31 Street Corp.,* 274 N.Y. 388, 9 N.E.2d 20 (1937), the government is entitled to only nominal damages, plus a refund of any advances and incidental expenses caused by the breach.

The government has not introduced any evidence with respect to incidental damages arising from Bedford's breach. *See* United States of America Proposed Findings of Fact. In addition, the government had not made any advance payments of rent to Bedford. Accordingly, the government would be entitled to only nominal damages.

The government has not established its entitlement to either benefit of the bargain damages or damages for the breach of the covenant of quiet enjoyment. Furthermore, the government has not established its entitlement to general contract damages including consequential damages. Nevertheless, Bedford was found to have breached the lease and the government is entitled to nominal damages for that breach. Accordingly, the government is hereby awarded nominal damages in the sum of $1.00 for Bedford's breach of the lease.

## CONDEMNATION

By Notice of Election dated November 19, 1981, and pursuant to 28 U.S.C. § 2409a(b), the United States elected to condemn a leasehold in the entire premises at 120 Church Street for a term of years commencing December 14, 1981 and ending October 31, 1988 with two five year renewal options. The government's election provided that during the term of the lease, it would assume responsibility for all services to the premises, including utilities, maintenance, alterations, and repairs and the costs thereof.

█  As a result of its condemnation of a leasehold interest and in accordance with § 2409a(b), the government must pay to Bedford and its assignee Bowery, just compensation for such possession. The task before this court then, is to determine what constitutes just compensation for the leasehold interest elected by the government. Just compensation "means the full monetary equivalent of the property taken" and is to be determined by reference to the fair market value of the premises at the time of the taking. *Almota Farmers Elevator and Warehouse Co. v. United States,* 409 U.S. 470, 473–74, 93 S.Ct. 791, 794, 35 L.Ed.2d 1 (1973).

Each of the parties introduced evidence of the fair market rental value of the premises in accordance with its highest and best use at the trial held before this court on December 29–30, 1981, and January 4–6, 1982. In accordance with Fed.R.Civ.P. 52(a) my findings of fact and conclusions of law follow.

The property in issue is located on the west side of Church Street, on the south side of Murray Street in downtown Manhattan. The neighborhood immediately surrounding 120 Church Street is a mixture of old and new office buildings with the preponderance built in the late 1950's and early 1960's. The property is 2½ blocks north of the World Trade Center and one block west of City Hall and the Woolworth Building. It is 1½ blocks east of the new million square foot Irving Trust building located at Murray and West Streets and 2 blocks north of the proposed site for the 1.5 million square foot office building that will be known as 7 World Trade Center. Ex. 306 at 5.

Directly south of the subject property is 110 Church Street, a 17 story building of

approximately 140,000 square feet of rentable area that was built in 1967. This building recently was rented in part to Dean Witter Reynolds, Inc. The building sold in April 1980 for $7,425,000 or approximately $53 per square foot. Diagonally across from this building is 99 Church Street, an 11-story office building containing 294,000 square feet that was built in 1961 and is occupied entirely by Dun and Bradstreet Inc.. Further south is a 15-story office building occupied by the United States Post Office. To the east of the subject property is a group of 5-story loft buildings with stores on the ground floor. Appraisal of Robert Von Ancken at 5–6. Access to 120 Church Street through public transportation facilities is excellent. Ex. 306 at 7; Ex. HH at 29.

In assessing the fair market rental of 120 Church Street, I am compelled to accord little or no weight to the opinion of the government's expert witness Alan J. Greenstein, R.M., S.R.A. Greenstein has not been certified by either the American Institute of Real Estate Appraisers or the Society of Real Estate Appraisers as qualified to appraise office buildings. Rather, both societies have certified him as qualified to appraise certain limited types of residential housing only. Neither Greenstein's testimony nor his resume indicate that he has any expertise in the appraisal of major office buildings or the Manhattan office market. Furthermore, compared to the affidavits of Bowery's expert, James G. Peel, M.A.I., C.R.E., and Bedford's expert, Robert Von Ancken, M.A.I., S.R.E.A., Greenstein's report contains obvious deficiencies such as the failure to provide for the possibility of retail use of the first floor space, the absence of a floor by floor rental analysis of the premises, and reliance on only the most generalized information concerning comparable office space in the vicinity of 120 Church Street.

■ The first issue that must be determined in evaluating the compensation to be paid by the government for the interest it has condemned in 120 Church Street is what constitutes the highest and best use to which the property can be put. There is no dispute that the highest and best use for the property is that of a multi-tenant office building. See Ex. HH, p. 34, Ex. 306, p. 18.

To establish the fair market rental value of the premises, the net rentable area of the various portions of the building must be determined. Then comparable leases may be compared to arrive at a reasonable rental price, on a "per square foot" basis, applicable to each of the different rentable building areas.

The net rentable area of a building, necessary for an assessment of fair market value, is determined according to standards set by the Real Estate Board of the City of New York. Ex. 306, pp. 3, 65; R. 28; A. 2010. This measure is distinct from the "usable" square footage which is calculated according to GSA standards. A. 2010; A. 788; see pp. 738–739, supra. Pursuant to Real Estate Board guidelines, deductions from the gross rentable area are made only for public elevator shafts, public stairs, fire tower and fire tower court, and the main telephone and electric switchboard room. Ex. 306, p. 65. In addition to these deductions, GSA makes a large number of deductions not recognized by the Real Estate Board. These include deductions for toilets and lounges, building equipment and service areas, entrance and elevator lobbies, stacks and shafts and fully enclosed convectors. A. 788. Since condemnation value is to be determined with regard to what Bedford could receive for the space on the open market, Real Estate Board standards rather than GSA standards must be applied in determining the net rentable area of 120 Church Street.

Although this court determined that the "rentable area" of 120 Church Street was 355,000 square feet following the plenary trial in this case, that determination which was based on Greenstein's first appraisal appears to have been incorrect.

Greenstein, without distinguishing between the different standards or setting forth the standard under which he determined "net usable or rentable area," has concluded that the building contains 355,000

net usable or rentable square feet. Greenstein Report, p. 11; Tr. at 27. Although Greenstein testified that he used Real Estate Board standards in arriving at this measure, his testimony concerning the areas of the building for which deductions were made is ambiguous and confusing. *See* A. 2270; Tr. at 28–29.

The net rentable area of 120 Church Street was measured by the architect of the building, Mr. Robert L. Bien. Bien calculated the net rentable area from his original plans for the building. Bien's calculations result in a total net rentable area of 406,-316.09 square feet. Affid. of Robert L. Bien, sworn to December 31, 1981. Bowery has suggested that the court adopt a figure of 400,000 net rentable square feet. It bases this figure on the finding made by its expert at the first trial in this case that the building contains in excess of 390,000 square feet and the 1963 appraisal by Harold N. Warsawer, M.A.I. for the United States which found that the building contains 392,955.1 net rentable square feet.

As Bowery's expert has described his own finding that the building contains more than 390,000 square feet as conservative and the only measurement introduced at retrial that purports to be accurate is the 406,000 square foot figure introduced by Bedford, the court finds that the building contains 406,000 net rentable square feet.

The next area of dispute among the experts is whether the property should be valued in "as is" condition, or whether any determination of reasonable rental price should include renovations. The government's expert is of the opinion that a reasonable landlord would consent to pay $3,000,000 to renovate 120 Church Street and that the cost of such renovations must be deducted from the rental value of the premises. Bowery's expert, James G. Peel, M.A.I., C.R.E. and Bedford's expert, Robert Von Ancken, M.A.I., S.R.E.A., agree that in the office rental market in downtown Manhattan in the vicinity of 120 Church Street a reasonable landlord on December 14, 1981 would have leased the premises in "as is" condition.

In my opinion, the conclusions of Peel and Von Ancken are fully credible in light of the increased demand for office space in the downtown Manhattan market, the skyrocketing costs of renovations, and the evidence that numerous "as is" leases have been negotiated in comparable buildings. Ex. 306 at 31–36; Ex. HH at 59–60. On the other hand, I find the opinion of the government's expert that a reasonable landlord in 1981 would have undertaken the same $12.00 per square foot workletter that he would have undertaken in 1978 to be unsupportable. This conclusion is blind to the factors of skyrocketing construction costs and rental values. Furthermore, Greenstein's conclusion that 120 Church Street would command an average rent of only $20 per square foot even with the $20.00 work letter is wholly inconsistent with the comparable rentals in comparable buildings in the vicinity of 120 Church Street. Accordingly, I find that a reasonable landlord would have leased the building in "as is" condition on December 14, 1981.

The next issue that must be determined is what the annual average rent per square foot at 120 Church Street was on December 14, 1981. In order to assess the fair market rental value of 120 Church Street, comparable rentals in comparable buildings in the vicinity of the subject premises were examined. Peel and Von Ancken opined that 120 Church Street, rented "as is" in December 1981, would command average office rents in the range of $18.25 (Peel) to $19.28 (Von Ancken) per square foot.

Based on a review of comparable rentals in comparable buildings in the vicinity of 120 Church Street, I find that the average fair market rent for office space at 120 Church Street as of December 14, 1981 is $19.28 per square foot.

Peel and Von Ancken agree that the highest and best use for the ground floor of 120 Church Street would be retail use. After reviewing the evidence in the record, I find that Von Ancken's figures of $20 per square foot for the west side and $30 per square foot for the east side of the building are the most reasonable.

I further find that the basement and sub-basement contain rentable space. After reviewing the evidence with respect to rents for space comparable to these areas, I find that rents of $12.00 per square foot for the basement and $9.00 per square foot for the sub-basement are reasonable.

In arriving at total rental value, the rentals set forth above must be applied to the net rentable square footage, determined in accordance with Bien's figures for the different areas of the building.

| SPACE | RENTAL PER SQ. FT. | SQ. FOOTAGE | TOTAL |
|---|---|---|---|
| OFFICE | $19.28 | 359,189.2 | $6,925,168 |
| RETAIL | $30.00 | 7,876 | $236,280 |
| RETAIL | $20.00 | 7,500 | $150,000 |
| BASEMENT | $12.00 | 14,531.4 | $174,377 |
| SUB–BASEMENT | $9.00 | 17,219.65 | $154,977 |
| TOTAL RENTAL VALUE | | | $7,640,802 |

The total rental income of $7,640,802 must be reduced by a factor to account for vacancy and non-collection. Based upon the evidence presented it appears that a 5% reduction factor should be applied to all rentable space other than retail space. This will result in a reduction of $362,726.10. It further appears that a reduction factor of 3% should be applied to retail space. This will result in a reduction of $11,588.40. The total reduction factor to be deducted from total rental value is therefore, $374,314.50. This leaves a gross rental income adjusted for vacancy and non-collection of $7,266,487.50.

Since the government has elected to assume responsibility for the provision of all building expenses incidental to the operation of 120 Church Street, other than the payment of real estate taxes and insurance premiums, those amounts must be deducted from the expected rental income to arrive at an annual payment which will represent just compensation for Bedford. In its post-trial brief, Bedford has used the average of the figures proffered by each of the experts in arriving at the reasonable amount that should be deducted for each service, except for electricity. I find that this procedure has resulted in fair and reasonable values for each of the services. Accordingly, the sum of $1,382,248 must be deducted from the adjusted gross rental for all building expenses except electricity.

According to Von Ancken, "the typical arrangement in most office buildings is for the tenants, to pay their own electric charges through either individual metering, on a pro rata basis using an electrical survey or on a dollar amount mentioned in the lease." Since 120 Church Street does not have individual meters, the individual tenants would be charged pro rata for their use of electricity and the owner would be responsible only for electricity consumed in public or common areas of the building such as lobbies and elevators. Von Ancken estimates the electrical charges for these public areas to be $117,000 per year. I find this assessment to be straightforward and reasonable. Accordingly, the further amount of $117,000 must be deducted from the adjusted gross rental for a net fair rental value of $5,767,239 per annum.

Since Bedford is responsible for the payment of real estate taxes, water, sewer and insurance charges during the term of the lease, no deduction should be made from the adjusted gross rental for the payment of such taxes and charges. The cost of real estate taxes has been determined using 1981–1982 as the base year.

Each expert testified that normal market leases for office space in Manhattan include a provision for escalation of the rent. Since Bedford would benefit from such a clause if it were to lease the premises to a private tenant or tenants, the government must similarly be required to pay rent which reflects this escalation. I find that in the posture of this case, the rent paid to Bedford by the government must reflect increases in the Consumer Price Index for New York City, using 1981 as the base year. Escalation is to be computed on an annual basis and is to be computed and paid on the last day of each year of the lease term, with the first escalation due on October 31, 1982.

The present value of the options the government has condemned is too speculative to evaluate at this juncture. Ac-

cordingly, it is the judgment of this court that a determination of the fair market value of the options the government has elected to condemn must await the government's decision as to whether it will exercise such options. Should the government elect to continue in occupancy after October 31, 1988, a new fair market rental can be set at that time. Bedford's request for an order requiring the government to give six months notice of whether it intends to exercise either of the renewal options is denied.

Because the government's condemnation was effective December 14, 1981, the United States is directed to pay in a lump sum the full amount of rent arrears owing since December 14, 1981. In addition, the government is directed to reimburse Bowery for all operating expenses paid or incurred by Bowery since December 14, 1981. Bowery is further awarded interest on these amounts in accordance with the provisions of 28 U.S.C. § 2411 and 31 U.S.C. § 724a.

■ In view of the government's failure to produce a qualified expert in this case, this court in the exercise of its equitable discretion, directs that Bedford be compensated by the government for the reasonable expenses incurred in retaining an expert, Robert L. Bien, to ascertain the rentable area of the property condemned by the government. *Cf. United States v. Lee,* 360 F.2d 449 (5th Cir. 1966) (where condemnee is put to expense of showing correct acreage condemned, it violates constitution to make him bear the cost of survey when government is on notice that condemnee claims that acreage being condemned is greater than amount claimed by government). Accordingly, Bedford is directed to submit an affidavit setting forth Mr. Bien's fees and expenses.

In accordance with the above, just compensation to Bedford, as of December 14, 1981, is $5,767,239 per annum, plus escalation. In addition, as part of the just compensation, the government must reimburse

Bedford for the costs incurred in determining the net rentable area of the premises to the extent set forth above.

## FORECLOSURE AND SALE

After the plenary trial in these consolidated actions, this court entered judgment quieting title to the premises at 120 Church Street in Bowery, foreclosing Bowery's mortgage against Bedford and the United States and ordering the assignment of rents to Bowery. *United States v. Bedford Associates,* 491 F.Supp. at 870. This judgment was affirmed by the Court of Appeals. *United States v. Bedford Associates,* 657 F.2d at 1315.

Pursuant to the judgment of this court filed on June 9, 1980 and order of this court filed on December 1, 1981, this matter was referred to Eugene P. Souther, Esq. to hear and compute the amounts due to Bowery in principal, interest and other charges due under Bedford's mortgage on 120 Church Street. The referee was further authorized to examine and report whether the mortgaged premises may be sold in parcels. Proceedings were duly held before the referee and his report was filed with the court on May 14, 1982. By motion returnable June 23, 1982, Bowery moved to confirm the Report of the Referee in all respects and for an order pursuant to 28 U.S.C. § 2001, directing the entry of an order and judgment of sale.[3]

In the proceedings before the referee, the parties stipulated to the amounts due and owing under the mortgage with the exception of reasonable attorney's fees, disbursements, charges and expert witness fees. Both Bedford and the government have objected to the referee's findings with respect to attorney's fees, disbursements, charges and expert witness fees. Only the government has objected to the report with respect to amounts due under the mortgage for principal, interest and other charges. The government's objection to this aspect

---

**3.** Bedford's contention that this court lacks subject matter jurisdiction to order foreclosure of the mortgage on 120 Church Street is merit-

less. *See United States v. Bedford Associates,* 657 F.2d at 1317.

of the report is that it does not account for the overpayments for which the government is entitled to restitution. *See* pp. 735–738 *supra*. It has been found, however, that the government must look to Bedford rather than Bowery for restitution. Accordingly, the government's objection to the report on this ground is unavailing.

Therefore, in accordance with the stipulation of the parties and the report of the referee, this court hereby confirms the following findings of fact and conclusions of law of the referee and directs that judgment be entered thereon.

(1) As of November 1, 1981, the principal balance due and owing under Bowery's mortgage on the premises is $10,222,096.03. Referee Findings of Fact and Conclusions of Law at 2.

(2) As of November 1, 1981, interest arrears due and owing Bowery under the mortgage amount to $605,415.78. Referee Findings of Fact and Conclusions of Law at 2.

(3) As of November 1, 1981, late charges due Bowery under the mortgage amount to $7,155.44. Referee Findings of Fact and Conclusions of Law at 2.

(4) As of November 1, 1981, funds of Bedford held by Bowery in the form of suspense credit and working capital amount to $92,124.19. Referee Findings of Fact and Conclusions of Law at 2.

(5) Accordingly, Bowery should recover from Bedford total unpaid mortgage principal, interest and late charges, (less suspense credit and working capital) as of November 1, 1981, in the amount of $10,742,543.06. Referee Findings of Fact and Conclusions of Law at 16.

(6) Because the mortgaged premises consist of one structure encompassing the entire parcel, the mortgaged premises may not reasonably be sold in parcels. Referee Findings of Fact and Conclusions of Law at 2.

Bowery's motion to confirm the report of the referee with respect to reasonable attorney's fees, disbursements, charges and expert witness fees will be the subject of a separate opinion as will the application of the referee for fees.

There being no just reason for delay, Bowery's motion for an order directing the entry of an order and judgment of sale pursuant to 28 U.S.C. § 2001 is hereby granted. The sale shall be upon the terms and conditions set forth in 28 U.S.C. § 2001, 2002 and Rule 37 of the Civil Rules of this Court.

## CONCLUSION

In accordance with the above, the government is entitled to restitution from Bedford in the sum of (1) $1,141,476.10 in rental payments and (2) $1,054,302.84 in utilities payments. The government also is entitled to nominal damages in the amount of $1.00 for Bedford's breach of the lease.

The fair rental value of the premises as of December 13, 1981 was $5,767,239 per annum, plus escalation. In addition, as part of the just compensation, the government must reimburse Bedford for the costs incurred in determining the net rentable area of the premises to the extent set forth above. The government also must pay to Bowery in a lump sum the full amount of rent arrears owing and operating expenses incurred since the effective date of its election, with interest as set forth above.

Finally, Bowery is entitled to recover from Bedford total unpaid mortgage principal, interest and late charges, less suspense credit and working capital as of November 1, 1981, in the amount of $10,742,543.06. Bowery's motion to confirm the report of the referee is granted to the limited extent set forth above. Its motion for an order and judgment of sale pursuant to 28 U.S.C. § 2001 is hereby granted.

SO ORDERED.