BERTHA BUILDING CORPORATION, Plaintiff-Appellant,

v.

NATIONAL THEATRES CORPORATION, Defendant-Appellee.

GUMBINER THEATRICAL ENTERPRISES, Inc., Plaintiff-Appellant,

v.

NATIONAL THEATRES CORPORATION, Defendant-Appellee.

Nos. 329, 330, Docket 24253, 24254.

United States Court of Appeals Second Circuit.

Argued May 9, 1957.

Decided Sept. 10, 1957.

On Rehearing Nov. 7, 1957.

Hand, Circuit Judge, dissented.

See also 242 F.2d 888.

Boris Kostelanetz, New York City (Corcoran, Kostelanetz & Gladstone, Arthur Karger, Theodore E. Gladstone, and Francis J. Mulderig, New York City, on the brief), for appellants.

Frederick W. R. Pride, New York City (John F. Caskey, Dwight, Royall, Harris, Koegel & Caskey, Charles F. Young and Stanley Godofsky, New York City, on the brief), for appellee.

Before HAND, CHASE and HINCKS, Circuit Judges.

HINCKS, Circuit Judge.

These are appeals by the plaintiffs from judgments of Judge Galston, dis-missing the complaints in two actions to recover treble damages under the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note. The only question presented is whether the actions were barred by the Statute of Limitations. In that connection, the crucial question is this: Was it proper for the judge instead of a jury to decide whether the defendant could have been sued in the Southern District of California between July 20, 1935 and July 20, 1938? This is critical because upon it depends the question whether the actions were barred by the Statute of Limitations when they were commenced in the Eastern District of New York on September 5, 1951; and why this is true appears from the following facts.

The Sherman Act, even after its amendment by the Clayton Act in 1914, deals with the Statute of Limitations only in § 5 of the second Act, 15 U.S.C.A. § 16, which provides that the period during which a suit in equity, brought by the United States, shall be pending shall toll the running of the statute as to "every private right of action * * based * * * on any matter complained of in said suit." Concededly such a suit was pending from July 20, 1938, until September 5, 1951, when these actions were begun. Except for this the law of New York controlled, and § 48(2) of the Civil Practice Act of that state fixes six years as the period of limitation for an action "to recover upon a liability

created by statute." Were this the only relevant section, the action of Gumbiner Co., in which the alleged damages were all suffered before Dec. 8, 1931, would have been barred in spite of § 5 of the Clayton Act, but the action of the Bertha Building Corporation in which the damages did not end before July 4, 1935, would not have been. However, § 13 of the New York Civil Practice Act provides that when a claim "arises outside of this state, an action cannot be brought in a court of this state to enforce" it "after the expiration of the time limited" by the law of the state where the claim arose, and since the claims at bar arose in California, the law of that state controls: i. e., § 351 of the California Code of Civil Procedure. This provides that, if the obligor of a liability is "out of the State" when it "accrues * * * the time of his absence is not part of the time limited for the commencement of the action." It is the defendant's position that it was not "out of the State" during the three years (the period of limitation in California), before July 20, 1938, because during all that time the plaintiffs could have sued it in the Southern District of California. If this was an issue properly tried to a judge, instead of to a jury, we all agree that Judge Galston's findings were not "clearly erroneous," so that at long last the outcome turns upon the answer to the crucial question posed in the opening paragraph of this opinion.

If the issue were one of whether the venue in each, or either, of the instant suits was proper we should agree that no jury question was presented; for it is clear that a judge may take that issue from a jury when it arises at a trial and decide it himself just as he might have done had it been raised before trial. But though decision as to whether these suits are barred by the statute depends upon whether National could have been sued by these plaintiffs in California before the California statute of limitations had run, and so comes down to a question of venue in respect to each of such suppositious suits, the critical issue in the instant actions remains whether the statute bars the suits. That issue is not to be treated as merely one of venue. A determination of this defense has a reach and a finality not inhering in any decision as to venue. For if the defense of the statutory bar is sustained, the resulting judgment of dismissal operates as a final adjudication of the merits of the controversy: a decision as to venue, however, of course leaves the plaintiff free thereafter to seek an adjudication on the merits of his claim. Fed.Rules Civ. Proc. rule 41(b), 28 U.S.C.A.

Inherent in that issue is the resolution of disputed questions of fact involving decision as to the credibility of witnesses and the need to weigh the evidence of National to the effect that it was doing business in the Southern District of California, now that it is to its advantage to take such a position, against its repeated allegations to the contrary in prior suits brought against it when it was to its advantage to take a stand diametrically opposed to what it is now attempting to prove. And it should not be forgotten that decision must be made in the light of fact findings as to many matters peculiarly within the knowledge of those in charge of the affairs of National during the critical period; and as to many occurrences which may seem to have chameleonic attributes when interpreted, or explained.

■ The burden is, of course, on National to establish its affirmative defense of the limitation statute. Pieczonka v. Pullman Co., 2 Cir., 102 F.2d 432. And when the plaintiff has made out a prima facie case of absence from the jurisdiction the burden is on the defendant to show that such absence has not tolled the running of the statute. Banister v. Solomon, 2 Cir., 126 F.2d 740.

■ Antitrust suits like these are triable as of right by jury if a party demands one. Ring v. Spina, 2 Cir., 166 F.2d 546. And if National's affirmative defense based on the statute of limitations tendered genuine issues of fact, they were also as of right triable by

836

jury. Jelliffe v. Thaw, 2 Cir., 67 F.2d 880; Chambliss v. Simmons, 5 Cir., 165 F. 419. Applicable, to be sure, is the rule that when the evidence is so one-sided that reasonable men would not differ as to the facts proved, the judge may take the issue from the jury, but we do not regard the evidence in this record in that category even without the admissions of National. However that may be, its admissions that it did no business in California and had no agents there during the relevant period should, we think, make it perfectly clear that there were genuine issues of fact which could not properly be taken from the jury: that it was erroneous to refer such issues to Judge Galston for trial without a jury.

We would hold further that the dismissal below cannot be sustained as one properly ordered on the pleadings. This was an alternative ground on which the order appealed from was based.

Apparently Judge Galston thought that proof that National prior to 1938 was a member of a conspiracy which was injuring the plaintiffs within California (proof essential to a recovery) would necessarily mean that National was "transacting business" in California within the meaning of § 12 of the Clayton Act and hence was entitled to prevail in its defense of the statute of limitations. In other words, he apparently thought that a fact essential to the proof of the claim also proved a defense to the claim. That analysis has indeed a superficial plausibility.

Admittedly, it is hard to see how a finding that National was not transacting business in California (without such a finding the plaintiffs cannot escape the defense of the statute) can square with a finding that National was part of a conspiracy which caused injury to the plaintiffs in California (without which no recovery can be had on the complaint). However, the apparent conflict between those findings can perhaps be solved by ascertaining which of the numerous alleged co-conspirators are proven to be such, if any, and the relationship which

exists between each of them and the plaintiffs. Not until this is done, do the cases interpreting § 12 of the Clayton Act [15 U.S.C.A. § 22] become relevant. The most recent Supreme Court discussion of this problem occurs in dictum in Bankers Life & Casualty Co. v. Holland, 346 U.S. 379, 74 S.Ct. 145, 98 L.Ed. 106, where Justice Frankfurter dissenting on another point observes that co-conspirators "as such" are not "agents" for purposes of venue.

■ We cannot bring ourselves to accept the suggestion in Giusti v. Pyrotechnic Industries, 9 Cir., 156 F.2d 351, that because of the presence within the jurisdiction of one co-conspirator all foreign corporations which are alleged to be co-conspirators are amenable to process. We think such doctrine inherently unsound and in conflict with the later pronouncement in Bankers Life, supra. The best discussion of the problem is in Independent Productions Corporation v. Loew's Inc., D.C.S.D.N.Y.1957, 148 F. Supp. 460. We agree fully with the rationale and holding of Judge McGohey's opinion in that case. Thus it is conceivable that the proofs may be such that a finding that National had no agents in California and acting independently had transacted no business there, and thus has not sustained its statutory defense, is not necessarily in conflict with a finding that it conspired with others to cause injury to the plaintiffs in California. The validity of a plaintiff's verdict, if one shall be returned, cannot be assessed until all the evidence is in.

Reversed and remanded for a jury trial of the issue raised by the defendant's plea.

HAND, Circuit Judge (dissenting).

If these plaintiffs had sued the defendant within the period from July 20, 1935 and July 20, 1938, and the defendant had moved to dismiss the actions, as it did move on several other occasions, although the judge who heard the motion might have himself decided all issues of fact, he would have been free in his discretion to refer them to a jury, either upon a trial

of that issue alone, or of the whole case. Rule 12(b) of the Federal Rules of Civil Procedure provides that among the defenses that a defendant may raise by motion is "improper venue," and Rule 43(e) provides that on any motion the court may hear the matter on affidavits, or "may direct that the matter be heard wholly or partly on oral testimony or depositions"; and there can be no doubt that this provision is constitutional. In a case depending upon the party's residence, the Supreme Court said: " * * while the court might have submitted the question to the jury, it was not bound to do so; the parties having adduced their testimony, pro and con, it was the privilege of the court, if it saw fit, to dispose of the issue upon the testimony which was fully heard upon that subject." Gilbert v. David, 235 U.S. 561, 568, 35 S.Ct. 164, 166, 59 L.Ed. 360. Earlier in Wetmore v. Rymer, 169 U.S. 115, 121, 18 S.Ct. 293, 296, 42 L.Ed. 682, where jurisdiction depended upon the amount in controversy, it said: " * * it would appear to have been the intention of Congress to leave the mode of raising and trying such issues to the discretion of the trial judge." See also Lehigh Valley Coal Co. v. Washko, 2 Cir., 231 F. 42, 46. However, although the judge in an action during the critical period would have been free to dispense with a jury, I do not see how we can say that he would have done so, and, since the defendant has the burden of proof on the issue of the statute of limitations, it failed to prove that the issue whether the defendant was "transacting business" in California would have been tried to a judge. I agree, therefore, with my brothers that Judge Rayfiel's order was wrong. Hence it follows that, if on the evidence before Judge Galston, a jury in an action brought in California might have found that the defendant had not "transacted business" in that state, the plaintiffs at bar were entitled to a verdict.

However, it seems to me that as on the evidence here at bar Judge Galston would have been bound to direct a verdict for the defendant if the case had been tried to a jury, Judge Rayfiel's error is immaterial. In short, I think that the defendant proved beyond dispute that it had been "transacting business" in California throughout the critical period. It will be necessary as a preliminary to deal with the plaintiffs' agreement that, regardless of whether the defendant had in fact been "transacting business," its denials that it had been in at least ten actions brought against it in both state and federal courts constituted a "judicial estoppel" against its present contradictory position. It is of course true that upon the trial in the actions at bar any statements made by the defendant in its pleadings and affidavits in other actions were competent evidence in favor of the plaintiffs; but I can find no warrant for the theory that they created a "judicial estoppel," except suggestions in one or two law reviews. Moreover, since such a doctrine is plainly contrary to the underlying basis of the whole doctrine of estoppel by judgment it is plainly without foundation. Judgment by estoppel is not designed as a moral sanction against inconsistency: it does not visit penalties upon those who take one position today and deny it tomorrow; it is designed only to prevent a party who has, or has not, prevailed upon an issue in an earlier action to vex the same antagonist with the same dispute in a later one. The plaintiffs cite Houghton v. Thomas, 220 App.Div. 415, 221 N.Y.S. 630, to the contrary, but Mack, the party against whom the estoppel there prevailed, although not a party to the earlier action, had been the attorney of one of the parties, which the court held to be the equivalent—itself a very doubtful extension of the doctrine.

The only issue therefore is whether the evidence before Judge Galston was in enough conflict to entitle the plaintiffs to a trial by jury. That makes it necessary to decide what § 12 of the Anti-Trust Act means by "transacting business." Section 7, 15 U.S.C.A. 15 note had allowed an action to be brought in any district in which the "defendant

resides or is found" and in the case of corporations this became "often an insuperable obstacle" to any remedy. Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 374, 47 S.Ct. 400, 403, 71 L.Ed. 684. The Supreme Court there held that in § 12 Congress added the clause, "transacts business," in order to assist the enforcement of the act by ridding actions of the web of refined decisions that had been woven about the word "found." It made no attempt, however, to state in general terms what constituted "transacting business" beyond saying (273 U.S. at page 373, 47 S.Ct. at page 403), that a corporation did so in any district "if in fact, in the ordinary and usual sense, it 'transacts business' therein of any substantial character." However, the Court discussed the issue at length in United States v. Scophony Corporation, 333 U.S. 795, 807, 808, 68 S.Ct. 855, 862, 92 L.Ed. 1091. In that case the defendant, a foreign corporation, had, as here, "transacted business" by means of a subsidiary corporation whose conduct it reserved the right to supervise and regulate. It is true that the issue was whether that made the defendant "found" within the district where it was sued, but since the Court held that it did, *a fortiori*, it was a ruling that the defendant had been "transacting business" there. Therefore, it seems to me that we can, and indeed must, take what was said as an authoritative gloss upon § 12. The Court declared that the statute meant the "practical, everyday business or commercial concept of doing or carrying on business 'of any substantial character'"; and that the amendment had substituted "practical, business conceptions" in place of "the previous hair-splitting legal technicalities encrusted upon the 'found'—'present'—'carrying-on-business' sequence."

Judge Galston made very detailed findings that are too long and too many, to quote, but I append numbers 10, 11 and 12, because these succinctly state the facts that appear to me to be controlling. The plaintiffs object that these improperly imputed to the defendant such or the described activities as took place after the organization of a corporation, which the findings speak of as "Agency": —a wholly owned subsidiary whose officers were "in the main" the defendant's officers. I rely upon the following language in United States v. Scophony Corporation, supra, 333 U.S. at pages 814, 815, 68 S.Ct. at page 865, which seems to me to make "Agency's" business "business transacted" by the defendant: "The contracts created controls in Scophony, and in the American interests as well, which taken in conjunction with the stock controls called for continuing exercise of supervision over and intervention in American Scophony's affairs. We need not decide whether, in view of the agreements' continuing and persuasive effects, they could be considered as sufficing in themselves to make Scophony 'found' within the New York district. Whether so or not, they set the pattern for a regular and continuing program of patent exploitation requiring, as we have said, Scophony's constant supervision and intervention."

I cannot see why this language does not apply almost literally, *mutatis mutandis*, to the contract of December 2, 1935, between the defendant and "Agency" along with which the defendant assigned to "Agency" the contract of Skouras Brothers of June 13. Of course it is true that a jury might not have believed the testimony offered by the defendant as to what was done under these contracts, although they did not put in any evidence to contradict it. Moreover, there might be a difficulty, if there had been no evidence that "Agency" had ever acted under the contract. However, that the plaintiffs may not assert, for it would cut the ground from under the complaints, which are based upon acts of the defendant after the contracts had been made. Hence, if the jury disbelieved the testimony of the defendant's witnesses as to what they had done, they must assume that other persons committed the wrongs charged in the complaints, and yet that they did not do so in performance of the contract with "Agen-

cy," for that contract, if once in effect, set up a "program" of "constant supervision and intervention"; and made the defendant "transact business." Surely we are not warranted in treating seriously such a web of dialectical fantasy.

The only evidence that the plaintiffs produced was the defendant's repeated assertions that it did not do any business in California, and had no agents there. Although, as I have said, these were indeed admissible against it, they amounted to no more than statements of the legal result of whatever the defendant had done, and they raised no issue as to the authority vested in the Skouras Brothers by the contract of June 13, 1935, and in "Agency" thereafter. Any conduct in California in performance of those contracts *ipso facto* made the defendant "transact business" in that state, no matter how often the defendant chose to deny that that had been the legal effect of what was done. I need not therefore answer the argument that all parties to a conspiracy are not mutual agents in the sense that what any one of them does is a "transaction of business" of all the rest.

In conclusion it seems to me worth while to observe that, although the result of my brothers' reasoning will indeed require the defendant to defend on the merits actions arising under the Anti-Trust Acts, toward which the Supreme Court, especially of late, has shown particular favor, it does so at the expense of a precedent of the greatest value to large corporations doing a wide interstate business. I cannot see why, if what we are deciding is right, a corporation by doing its local business through subsidiary corporations over whom it retains supervisory control, will not compel those whom it may damage to sue in some district where it can be "found," as distinct from any one in which it "transacts business." If so, the whole purpose of the amendment to § 12 will be defeated.

## APPENDIX

"10. National Agency Corporation, a wholly-owned subsidiary of National, is a Delaware corporation which was organized in 1935. The name of this company was changed to National Theatres Amusement Co., Inc., and it was referred to at the trial by both names. It is referred to in these findings as 'Agency.' Agency was organized to render certain services and perform certain activities for National, which prior to the organization of Agency had been rendered and performed by National. Agency qualified to do business in New York in February, 1936, and in California in August, 1942. The same individuals were, in the main, the officers of National and of Agency. The two companies occupied the same premises.

"11. Agency entered into a contract with National on December 2, 1935, under which Agency agreed to perform extensive services for National and its subsidaries. Under that contract Agency agreed to keep National fully informed of all matters relating to the affairs and business of National and its subsidiaries, including, with respect to the operating subsidiaries, the daily results of theatre operations, profits and losses, cash position, nature of the properties owned and changes therein and the general corporate set-up of all such subsidiaries. Agency agreed to maintain National's books of account and furnish other accounting services such as preparation of statistical information, tax returns and similar matters. National agreed to pay Agency $3,000 per week for the services rendered to and for it. Throughout all of the period from the date of the contract in 1935 until the institution of these actions in 1951, Agency performed services for National and its subsidiaries as provided in that contract. Such services were performed in California and in New York and elsewhere.

"12. The contract of June 13, 1935, between the Skouras brothers and National was assigned to Agency on December 2, 1935. The assignment provided that National, however, retained all its rights under its contract with the Managers. The assignment contained the following provision:

" 'It is understood that notwithstanding such assignment to you, we retain all our rights and privileges under said contract, including, without limitation, the right to terminate the same, and that by such assignment you receive only the rights to the services of the Managers above referred to and the right to enforce performance thereof in any way not inconsistent with our rights in such connection * * *.'

"Under the employment contracts with the Skouras brothers, National paid their salaries until Agency was formed. After the organization of Agency, the fixed salaries were paid by that company pursuant to the assignment from National to Agency, but the portion of their compensation which was based upon the profits of National was paid by National. The payments made by Agency were made by it as the agent for National and for all purposes here were the same as though made directly by National."

On Petition for Rehearing
PER CURIAM.

By its petition for rehearing the defendant, National, persuades us to amplify and modify our original opinion and decision.

We are unmoved by the petitioner's contention that we were wrong in asserting that a dismissal based upon a defense of the statute of limitations is an adjudication on the merits. Warner v. Buffalo Drydock Co., 2 Cir., 67 F.2d 540, which is cited in support of that contention, we think is distinguishable. And moreover, it has been superseded by the clear mandate of Rule 41(b) of the Federal Rules of Civil Procedure, 28 U.S. C.A. which in its last sentence directly contradicts the holding of the Warner case. Although under the rule in a proper situation the District Judge may

specify that his order be without prejudice, Judge Galston did not so qualify his order of dismissal.

We think, however, that National is right when it now urges that we failed to consider the impact of the New York statute of limitations on the Gumbiner cause of action. The Bertha cause of action arose in 1935 which was within six years of the Paramount action. United States v. Paramount Pictures, D.C., 85 F.Supp. 881. Thus as to Bertha the six-year New York statute, Civil Practice Act, § 48(2), could not possibly have run and the crucial question was whether the three-year California statute had run, as we correctly stated in the opening paragraph of our original opinion. However, in the Gumbiner case there was another question equally crucial, viz., whether the New York statute of limitations had run. For the Gumbiner cause of action accrued on December 8, 1931. Thus if the New York statute was not tolled by National's absence, the Gumbiner action was barred here in December, 1937. Section 13 of the New York Civil Practice Act[1] is alternative in operation: if the statute has run either in California or in New York the suit is barred here.

Gumbiner argues that the New York law should determine whether in fact the statute has been tolled. From this premise it asserts that under state law, although National may have been amenable to process in New York, the statute was nevertheless tolled during that period. This argument derives from an analogy to an individual debtor who has hidden out in an obscure part of the state under an assumed name. If a creditor can find him, such a debtor is amenable to process: but while he is thus hiding the statute of limitations is tolled. Gumbiner thus concludes that even if National was amenable to process

1. Section 13 in pertinent part reads as follows:
  "Where a cause of action arises outside of this state, an action cannot be brought in a court of this state to enforce such cause of action after expiration of the time limited by the laws either of this state or of the state or country where the cause of action arose, for bringing an action upon the cause of action * * *".

in New York, its presence was not open and notorious and on that account the statute was tolled during the relevant period.

Even if New York law does determine tolling (a proposition we need not decide in this case), this argument is fallacious. For the tolling statute (C.P.A. § 19)[2] during the relevant period had a subdivision (2), which declared, "Nor does this section apply while a foreign corporation has had or shall have one or more officers in the state on whom a summons for such corporation may be served." On the record in this case that section was applicable: National did have officers in the state. Gumbiner would read in a further requirement of open and notorious conduct. But all of the New York cases cited in support of this proposition are concerned with individual defendants, most of whom have just entered the state or have just returned to it. Not one case applies an "open and notorious" requirement to a foreign corporation otherwise amenable to process throughout the statutory period. Indeed, in Mack v. Mendels, 249 N.Y. 356, 164 N.E. 248, 61 A.L.R. 386, Judge Lehman admonishes the courts construing C. P. A. § 19 to read it as the Legislature wrote it and not to imply further requirements.

Gumbiner further urges that National was not amenable to process in New York under either federal or state standards. We disagree. A careful review of the evidence before Judge Galston on the question of whether the New York statute was tolled has convinced us that, if the facts had been heard by a jury, Judge Galston would have been required to set aside a plaintiff's verdict on this issue. Even though the jury might have disbelieved every one of defendant's witnesses, the documentary evidence recited in Judge Galston's findings was overwhelming.[3] Regardless of which stand-

---

2. The main paragraph of § 19 in its present form reads:

"If, when the cause of action accrues against a person, he is without the state, the action may be commenced, within the time limited therefor, after his coming into or return to the state. If, after a cause of action has accrued against a person, he departs from the state and remains continuously absent therefrom for the space of four months or more, or if, without the knowledge of the person entitled to maintain the action, he resides within the state under a false name, the time of his absence or of such residence within the state under such false name is not a part of the time limited for the commencement of the action."

3. The following findings of Judge Galston were based solely on a stipulation and on evidence corroborated by documentary evidence.

"32. National's Board of Directors held all of its meetings in New York and transacted its business there from 1930 to June, 1936. From June, 1936, to January, 1944, the Board met in Jersey City, New Jersey. After January, 1944, corporate meetings were again held in New York. All meetings of National's Executive Committee were held in New York during the existence of such Committee, i.e., from December 5, 1934, to January 3, 1936.

"33. National's agent, Agency, maintained an office from June, 1936, until the date these actions were begun at 444 West 56th Street, N.Y., in space rented from Twentieth Century-Fox. All officers of Agency had their offices at that address from that time until Agency opened an office in Los Angeles in August, 1942. The Board of Directors of Agency met weekly in New York.

"34. From the date of its organization to the date of the institution of these actions, Agency performed substantial and continuous agency services for National and National's subsidiaries in New York. Agency maintained the payroll for its own and National's employees, kept National's books of account and performed in New York extensive supervisory, advisory, operating and managerial activities and services for National and its subsidiaries which it had agreed to perform under its contract of December 2, 1935, with National.

"37. National continuously maintained a bank account or accounts in New York from 1930 throughout the period here involved. Its main account was with The Chase National Bank of the City of New York and that bank was National's principal banker. National also had accounts with the Commercial National Bank and Trust Company, The Marine Midland Trust Company and the Guaranty Trust Company of New York.

ard is applied it is irrefutable that National was amenable to process in New York during the relevant period. United States v. Scophony Corp., 333 U.S. 795, 68 S.Ct. 855, 92 L.Ed. 1091; Pomeroy v. Hocking Valley R. Co., 218 N.Y. 530, 113 N.E. 504; see, also, Chaplin v. Selznick, 293 N.Y. 529, 58 N.E.2d 719.

■■ We now hold, therefore, that the Gumbiner action, since the New York statute was not tolled by National's absence from New York or by its unpublicized activity in New York, is barred and that the District Court's dismissal of that action must be affirmed.

"38. National borrowed money from time to time in New York from New York banks. In 1930 National borrowed a total of $19,350,000 from The Chase National Bank in three loans. In 1931 it borrowed $15,000,000 from The Chase National Bank. In 1932 National arranged for substantial loans for its California subsidiaries from The Chase National Bank and unconditionally guaranteed payment of these loans. National hypothecated its assets with the bank in order to borrow money. As a result of those loans The Chase Bank was National's largest creditor until November, 1934, when it acquired 58 per cent of the stock of National in exchange for the indebtedness owed to it by National and National's subsidiaries.

"39. In October, 1934, National, in New York, issued debentures in the amount of $5,270,000 to Fox Film Corporation, dated as of March 4, 1933, to reflect National's indebtedness to Fox Film Corporation. The Empire Trust Company of New York was trustee under the trust indenture. Those debentures were exchanged for stock of National in the reorganization of November 14, 1934.

"40. In 1935 a line of credit in the amount of $750,000 was established with the Commercial National Bank & Trust Company of New York. Loans from that bank were negotiated in 1935 and 1937.

However, the majority of the court adheres to its holding that since the question of tolling in California presents substantial fact questions the Bertha case must be reversed and remanded for trial by jury on the limitations question.

Petition granted and our previous decision is modified to provide

As to the Gumbiner case, affirmed;

As to the Bertha case, reversed and remanded.

Circuit Judge HAND again votes to affirm both judgments for the reasons stated in his earlier opinion and without passing on the opinion now rendered in the Gumbiner appeal.

"41. From 1930 throughout the period here involved the dividends which National received from its subsidiaries were received by it in New York and the dividends paid by National were paid in New York. National had substantial assets.

"42. National itself paid no utility charges directly to any utility company. It paid a regular charge, however, to its parent Twentieth Century-Fox Film Corporation for services such as utilities, office space and the like. From and after June, 1936, payments for these facilities were made by Agency.

"43. National itself did not have a telephone listing prior to the summer of 1935. Thereafter it was listed in the Manhattan telephone directory as "National Theatres Corporation, see National Theatres Agency Corporation." Prior to 1935 it had used the telephone facilities of Twentieth Century-Fox without a listing and all calls came in through the Twentieth Century-Fox switchboard. Charges for the use of these telephone facilities were included in the regular amounts paid by National to Twentieth Century Fox."

In addition, several contracts are in the record which list 444 W. 56 St., New York City, as National's office address and the address to which notices may be sent. In a "Consent of Guarantor" defendant is stated to have an office and place of business in New York City.