713 F.2d 895
 UNITED STATES of America, Plaintiff-Appellant,
v.
BEDFORD ASSOCIATES, a Partnership, Doris K. Carver and
Samuel Ades, individually and as partners of
Bedford Associates, and Amcar Management
Corp., Defendants-Appellees,
and
The Bowery Savings Bank, Intervenor-Appellee.
The BOWERY SAVINGS BANK, Plaintiff-Appellee,
v.
BEDFORD ASSOCIATES, a Partnership, Doris K. Carver and
Samuel Ades, individually and as partners of
Bedford Associates, Defendants-Appellees,
and
United States of America, Defendant-Appellant.
 Nos. 967, 1107, Dockets 82-6307, 83-6003.
 United States Court of Appeals,
Second Circuit.
 Argued March 31, 1983.
Decided July 14, 1983.
 
 William J. Brennan, Asst. U.S. Atty., New York City (John S. Martin, Jr., U.S. Atty., S.D.N.Y., Michael H. Dolinger, Thomas D. Warren, Asst. U.S. Attys., New York City, on brief), for plaintiff-appellant.
 Arthur Richenthal, New York City (Richenthal, Abrams & Moss, New York City, on brief), for defendants-appellees Bedford Associates et al.
 Terence F. Gilheany, New York City (Howard R. Hawkins, Jr., John F. Mariani, Terrence J. Connolly, Cadwalader, Wickersham & Taft, New York City, on brief), for plaintiff-appellee Bowery Sav. Bank.
 Before KEARSE, PIERCE, and PRATT, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 In its third set of appeals to this Court in these consolidated actions, the United States challenges judgments and orders of the United States District Court, Henry F. Werker, Judge, which, principally, (1) awarded the United States nominal damages and limited restitution from defendants-appellees Bedford Associates, et al. ("Bedford"),[1] for Bedford's breach of its lease agreement with the government for the building at 120 Church Street in New York City (the "building"), (2) denied the government any restitution from intervenor The Bowery Savings Bank ("Bowery") for payments made by the government to Bowery in connection with the building, and (3) ordered the government to make annual rental payments of $5.7 million, plus escalation, as "just compensation" for its condemnation of a leasehold interest in the building as of December 14, 1981. For the reasons below, we conclude that the judgments of the district court should be modified to (1) grant the government restitution from Bowery in the amount of approximately $76,000 paid by mistake and retained by Bowery with knowledge of the error, and (2) increase by $81,485 the amount of restitution awarded to the government from Bedford. In all other respects we affirm the judgments.
 
 I. BACKGROUND
 
 2
 The factual background of the litigation is set forth in detail in our prior opinions in these cases, United States v. Bedford Associates, 618 F.2d 904 (2d Cir.1980) ("Bedford I "), and United States v. Bedford Associates, 657 F.2d 1300 (2d Cir.1981), cert. denied, 456 U.S. 914, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982) ("Bedford II "), familiarity with which is assumed. For the purposes of this appeal the facts may be summarized briefly as follows.
 
 A. The Events Leading to Bedford I and II
 
 3
 The building is owned by Bedford and mortgaged to Bowery and has been occupied since 1962 by the United States Internal Revenue Service ("IRS"). In October 1978 IRS's lease expired, and the United States General Services Administration ("GSA") sought, having conducted tortuous negotiations with Bedford, to enter into a new lease with Bedford. See Bedford I, 618 F.2d at 908-11. Bedford refused to sign a lease at the rental tendered by the government, and eventually threatened IRS with discontinuation of services to the building. The government brought suit for specific performance of the alleged lease agreement, see id. at 916, 918, and obtained a preliminary injunction against the discontinuation of services; the injunction was granted on the condition that, pending determination of the merits of the suit, the government pay rent and utilities expense.[2] In Bedford I we largely affirmed this injunction, although we reduced prospectively the utilities payments required from the government as a condition of its obtaining the injunction. Id. at 923. Following entry of our order reducing the amount to be paid, the government continued for three months to pay at the prior, higher rate, making its payments to Bowery, which had intervened and commenced a foreclosure action on the building. Bowery, after consulting its counsel, elected to retain in silence such excess amounts as the government mistakenly paid, which apparently totaled about $76,000.
 
 
 4
 Following our remand in Bedford I, a bench trial (the "1980 trial") was held on the merits of the various claims, which included the government's claim for specific performance, a counterclaim by Bedford for damages, and Bowery's claim for foreclosure of the mortgage. In an opinion reported at 491 F.Supp. 848 (1980), the district court ruled against the government and in favor of Bedford with respect to the lease dispute, and granted Bowery's foreclosure claim against Bedford and the government. Most pertinently for the purposes of the present appeal, the court ruled that (1) because of Bedford's repeated attempts to amend its lease offer to GSA and because of several open terms, no lease agreement had been formed between Bedford and the government, and (2) even if a contract had been formed it would have been unenforceable by the government against Bedford because of unconscionability, duress, and misrepresentation by GSA in its dealings with Bedford. The court thus entered judgment in June 1980 dismissing the government's action against Bedford and ordered the government to pay damages to Bedford based on the fair rental value of the building as of the date of trial.
 
 
 5
 We reviewed these rulings in Bedford II, in which we principally disagreed with the district court's view that no agreement to lease had been formed, see 657 F.2d at 1308-12,[3] but agreed that, in light of the findings of bad faith on the part of GSA, the court could properly deny the government specific performance of the lease agreement, id. at 1314.[4] We held that the agreement that had been formed would have required the government to pay Bedford rental of $2,226,194 per year (or $185,516 per month), plus increments for certain renovations of the building, and to pay annual rental of $2,902,160 (or $241,847 per month) when renovations were completed. Id. at 1304, 1311. We left it to the district court, however, to determine whether GSA's conduct should be deemed to have excused Bedford from making the renovations. We remanded the case in order for the government to make an election, within 60 days of our mandate, whether to vacate the building or to condemn some interest in it, and for the district court to determine what damages the government should recover from Bedford. We concluded as follows:
 
 
 6
 [W]e reverse the judgment of the district court insofar as it dismissed the government's action for damages and awarded damages to Bedford; modify it insofar as the monetary award to Bowery was based on fair market rental of the property rather than the rental specified in the lease; and affirm it insofar as it denied specific performance to the government, declared that the government no longer has a leasehold interest in 120 Church Street, foreclosed Bowery's mortgage, quieted title to the building as requested by Bowery, and awarded Bowery an assignment of rents. We remand the matter for adjustment of the rental due Bowery under the decree, for trial of the government's action for damages, and for such other proceedings as may be appropriate.
 
 
 7
 Id. at 1318-19.
 
 
 8
 B. The Proceedings and Decisions Following Bedford II
 
 
 9
 Our mandate in Bedford II issued in September 1981, and on November 19, 1981, the government elected to condemn a leasehold interest in the entire building, to commence on December 14, 1981, and continue through October 31, 1988, with options to renew for the two succeeding five-year periods. The government elected to assume responsibility for all services to the building.
 
 
 10
 The trial on damages (the "1981 trial") followed shortly. The government sought three categories of damages: (1) restitution, from both Bedford and Bowery, of so much of the rent and utilities it had paid during the course of the lawsuit as exceeded the amounts for which Bedford I and II had determined it was liable; (2) damages for the loss of its lease bargain, which it described as the amount by which the fair market value of the leasehold interest condemned as of December 14, 1981, would thenceforth exceed the rental set by the lease agreement; and (3) consequential damages on account of Bedford's alleged failure to maintain the building. The parties stipulated the precise amounts paid by the government for rent and utilities during various pertinent periods, and both sides presented evidence as to the fair market rental value of the building as of December 14, 1981. No evidence was presented as to the fair rental value at any earlier time.
 
 
 11
 In an opinion reported at 548 F.Supp. 732 (1982), the district court granted the government considerably less relief than was requested. As to the claim for restitution, the court ruled that the government was not entitled to recover excess utilities payments for any period prior to June 1980. It reasoned that the pre-June 1980 period was governed by the preliminary injunction and that the government's required payments during that period were " ' "the price of [preliminary injunctive] relief" ' " allowing the government to remain in the building, id. at 737 (quoting Bedford I, 618 F.2d at 917 (quoting Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas Railroad, 363 U.S. 528, 531, 80 S.Ct. 1326, 1328, 4 L.Ed.2d 1435 (1960))), and were therefore not subject to the equitable remedy of restitution. As to rental payments, the court ruled that since GSA's delays had "caused the commencement of renovations to be postponed until a time when construction costs had skyrocketed and performance would have been economically devastating to Bedford," 548 F.Supp. at 737, the government could recover rental payments only to the extent that they exceeded $241,847 per month, the amount that was to have been payable upon Bedford's completion of renovations.[5] On the basis of these rulings, the district court awarded the government restitution of $1,141,476 in rental payments and $1,054,303 in utilities payments. It rejected the government's request for restitution of these amounts from Bowery, and ruled that the government could recover such sums only from Bedford, stating as follows:
 
 
 12
 Bowery ... has applied all rents received to pay existing debts of Bedford and to maintain the premises. Having received only that to which it was entitled under the terms of Bedford's mortgage, it is evident that Bowery did not benefit unjustly from the government's overpayments. [Citations omitted.] Under these circumstances, it would be "patently unfair" to require Bowery which stands in the position of "an innocent payee who has received and used the money to satisfy a debt," to repay the money. Equilease Corp. v. Hentz, 634 F.2d [850, 853 (5th Cir.1981) ].
 
 
 13
 Bedford, on the other hand, did receive the benefit of satisfaction of pre-existing debts as a result of the government's overpayments. Consequently, it is Bedford and not Bowery that may be required to make restitution to the government. See Eightway Corp. v. V. Ponte & Sons, Inc., 99 Misc.2d 989, 420 N.Y.S.2d 836 (App.T. 2d Dep't 1979).
 
 
 14
 Id. at 736 (footnote omitted).
 
 
 15
 As to the claim for damages for Bedford's breach of the lease agreement, the court awarded the government nominal damages of $1. It found, in accordance with the government's proposed findings of fact, that the breach had occurred on December 13, 1978, when Bedford refused to sign the lease tendered to it by GSA. Noting that, although the government had presented no evidence as to the fair rental value of the building as of that date, it had repeatedly argued to the court that the fair rental value on November 1, 1978, was the same as the rent set forth in the proposed lease, i.e., $241,847 per month on completion of renovations, the court ruled that the government was "estopped from changing its position and arguing that the fair market rental of the leasehold was higher on that date." Id. at 740. The court concluded that the government was thus entitled only to nominal damages:
 
 
 16
 As there was no difference between the asserted rental value of the premises for the term of the lease and the agreed rent as of December 13, 1978, the government's "benefit of the bargain" damages would be zero and it would be entitled to an award of nominal damages only.
 
 
 17
 Id. The court ruled also that the government had failed to prove any consequential damages. Id. at 742.
 
 
 18
 Finally, after hearing conflicting expert testimony, the court established the fair market value of the leasehold interest condemned by the government as of December 14, 1981, as $5,767,239 per year, plus annual escalation in accordance with the New York City Consumer Price Index. Id. at 744-45. It ordered the government to pay that rental to Bowery, as Bedford's assignee, effective immediately, and to pay Bowery a lump sum representing rent arrears since December 14, 1981, plus operating expenses and interest. Id. at 746.
 
 II. DISCUSSION
 
 19
 On this appeal, the government challenges the rulings of the district court in a number of respects. Principally it contends that the court erred in (1) denying it restitution of $692,299.84 for utilities payments made prior to June 1980, (2) granting Bedford $81,485 as credit for rental due as if renovation of the building had been completed in November 1978, (3) as to amounts that the government was found entitled to recover from Bedford, denying the government restitution from Bowery as well, and (4) awarding the government only nominal damages for Bedford's breach of the lease agreement. Finally, although the government does not challenge the amount fixed by the court as the fair rental value of the building, it contends that the court erred in ruling that the government's liability to pay rent based on that value dates back to December 14, 1981, rather than awaiting a foreclosure sale of the building. We have examined all of the government's contentions and find merit in only two: that the government was entitled to restitution of approximately $76,000 from Bowery paid by mistake, and that Bedford was improperly credited with $81,485 for rental payments due.
 
 
 20
 A. Restitution for Utilities Payments Prior to June 1980
 
 
 21
 The government's contention that it is entitled to restitution for $692,299.84 in utilities payments rests upon the premise that, pending a decision on the merits of the litigation, the government was required to pay an amount representing the building's utilities expense that was (1) reduced on an interim basis in Bedford I, and (2) found unwarranted in Bedford II. The government argues that it is entitled to recover the excess of what it paid over what was held owing, invoking the principle that "[a] person who has conferred a benefit upon another in compliance with a judgment ... is entitled to restitution if the judgment is reversed or set aside, unless restitution would be inequitable." Restatement of Restitution § 74 (1937); see, e.g., Baltimore & Ohio Railroad v. United States, 279 U.S. 781, 49 S.Ct. 492, 73 L.Ed. 954 (1929). As a general matter, we reject the government's argument because the principle is inapposite.
 
 
 22
 The essential premise of the government's argument is that the preliminary injunction pursuant to which it made utilities payments compelled it to make such payments. This characterization of the injunction is, however, foreclosed by our ruling in Bedford I. There, in rejecting the government's contention that the district court had no jurisdiction to order it to make any payments whatever, we pointed out that the injunction had been entered against Bedford, not against the United States. The government was not in fact required by the court to make any payments; only if the government chose to invoke the equity powers of the court to force Bedford to provide services to the building, was it to pay Bedford any moneys. We held that even recognizing the established limits on the court's power to order the government to make payments in a contract dispute, the district court had the power to condition the relief sought on the government's payment for utilities:
 
 
 23
 Such a condition merely expresses the price the suitor must pay in order to obtain the benefit sought from his opponent, and the suitor can with impunity decide not to pay the price by simply electing to forego the benefit he had previously demanded.
 
 
 24
 ... [W]e construe the district court's order as an injunction against Bedford which was conditioned on the government's payment of utilities, and not as an order that the government pay utilities irrespective of its demand that Bedford continue to operate the 120 Church Street building.... [T]he government has not been ordered to pay rent and utilities independently of its own insistence on having Bedford operate the building for the government's continued occupancy.
 
 
 25
 618 F.2d at 914. Had the government refused to pay utilities under the preliminary injunction, it would have lost the services it sought, but no action would have been available against it for violating an order of the court.
 
 
 26
 In the present case, therefore, the circumstances lacked the element of coercion that attends payments pursuant to judicial order. See 2 G. Palmer, The Law of Restitution § 9.9 (1978). Thus, the principle of restitution embodied in § 74 of the Restatement is inapplicable.
 
 
 27
 The government also seeks support for its restitution claim by arguing that in Bedford I we "specifically stated that restitution would be in order should the Government prevail on the question whether the parties had entered into a valid agreement." (Brief of United States on appeal at 22.) The government has misdescribed the Bedford I footnote on which it relies and has ignored the fact that, on the pertinent claim, it did not prevail.
 
 
 28
 In Bedford I the government had attempted to appeal from an order denying its motion to require Bedford to post a bond in connection with the preliminary injunction granted to the government. Although we found that order unappealable, we observed as follows:
 
 
 29
 In any event we find no error in the district court's refusal to require Bedford to post an injunction bond, even if Bedford were to be considered an "applicant" for purposes of Fed.R.Civ.P. 65(c). The parties in this case have an ongoing relationship, and if the government prevails it will be able to recoup any excess payments out of future rent due.
 
 
 30
 618 F.2d at 917 n. 23. The hypothesis that the government might "prevail" was not, as the government would have it, focused solely on the limited issue as to whether or not there was a valid agreement. Rather our observation focused on the overall matter of whether the government would eventually be held entitled to specific performance of the lease agreement. Not only is this the more normal reading of the word "prevail" when, as in the passage quoted, no issue such as contract formation has been singled out; but, in addition, the notion that the government must prevail on its overall claim for specific performance is implicit in the reference to "future rent due"--a circumstance that would obtain (under the conditions extant at the time of Bedford I ) only if the government were granted specific performance.
 
 
 31
 Finally, we find no abuse of discretion in the district court's decision that the United States should not have restitution of "the price" it had paid to obtain preliminary injunctive relief. Restitution is an equitable remedy resting in the sound discretion of the trial court. E.g., Atlantic Coast Line Railroad v. Florida, 295 U.S. 301, 309-10, 55 S.Ct. 713, 716-17, 79 L.Ed. 1451 (1935). Here the government, by obtaining the preliminary injunction, had in effect secured temporary specific performance of the lease agreement pending adjudication of the merits of the lawsuit. That adjudication resulted in the district court's determination, which we upheld in Bedford II, that the government should not have specific performance because of the inequitable conduct of GSA. Hence the court could properly conclude that the government had gained as interim relief more than that to which it was equitably entitled, and that it should be denied any "refund" of the purchase price of that relief.
 
 
 32
 As a general matter, therefore, we uphold the district court's refusal to award the government restitution with respect to utilities payments made prior to June 1980.
 
 
 33
 There is, however, one limited set of payments in that period as to which we conclude the district court should have granted the government restitution. This set of payments was made by the government to Bowery following issuance of our mandate in Bedford I. In that decision we reduced the government's required payments from the total amount of utilities expense to $14,000 per month. GSA, however, inadvertently continued to pay all utilities expense from March through May 1980. Bowery was aware of our ruling that the government was not required to pay Bedford--or Bowery for the account of Bedford--more than $14,000 per month; and the record reveals that Bowery was conscious, from the start, of the government's sizable overpayments. Thus, on or prior to April 1, 1980, it discussed the overpayments with its counsel,[6] and it elected to retain all amounts paid and not to notify GSA that the government had overpaid. The payments apparently totaled some $118,000, or $76,000 more than the $42,000 Bowery was entitled to receive.
 
 
 34
 We can hardly regard Bowery's nondisclosure of the overpayments and its resistance to repayment as other than inequitable conduct, and we conclude that the government should have been awarded restitution from Bowery of those inadvertent overpayments. See 2 G. Palmer, supra, § 12.3(a), at 552-54.
 
 
 35
 B. Restitution from Bedford for Excess Rental
 
 
 36
 The district court awarded the government restitution from Bedford in the amount of $1,141,476 for excess rental payments made between June 1980, when the first final judgment required the government to pay Bedford fair rental value for the building as of the time of the 1980 trial, and September 1981, when our mandate issued in Bedford II reversing that judgment and ruling that the government was entitled to pay the agreed rental until such time as it condemned an interest in the building (or was required to vacate). In arriving at this amount, the court ruled that the government was obligated to pay Bedford rent at the rate of $2,902,160 per year from November 1, 1978. The government contends that this ruling overcredited Bedford by $81,485. We agree.
 
 
 37
 The question of Bedford's entitlement to the $81,485 relates to renovations that the lease agreement called for Bedford to make in the building. Until the renovations were made, Bedford was to receive rent of $185,516 per month, plus increments as renovations progressed; when renovations were completed Bedford was to receive rent of $241,847 per month. In remanding in Bedford II for calculation of the government's damages on account of Bedford's breach of the lease agreement, we left it to the district court to "consider whether GSA's delay in securing congressional approval of the lease constituted a lack of cooperation sufficient to excuse Bedford from its obligation to renovate." 657 F.2d at 1317. On remand the district court did consider the effect of GSA's delay, and it concluded that Bedford was excused from making any further renovations in the building. 548 F.Supp. at 737. We have no difficulty with this conclusion, but do not agree with the district court's leap to the further conclusion that this entitled Bedford to collect rent at the $241,847 per month level as of November 1, 1978.[7]
 
 
 38
 The lease agreement was imprecise as to the schedule for Bedford's completion of renovations. It anticipated that 17 floors were to be renovated at the rate of two every two months and seemed to contemplate that some floors would have been completed before November 1978 and some would be completed thereafter.[8] Although the exchange of communications that led to the lease agreement did not fix a starting time for Bedford's renovations, we note that GSA's solicitation of bids had required that offers remain open until April 15, 1978. Thus, Bedford could not have been certain of having its bid accepted prior to that date and could not reasonably have expected to commence renovations much before that date. At the rate of two floors per month starting in April 1978, renovations would not have been completed prior to September 1979.
 
 
 39
 Bedford does not quarrel with the government's premise that if renovations had proceeded according to this schedule, Bedford would have received $81,485 less in rent than it was awarded by the court; rather, it argues principally that the court found it was excused from performing the renovations. This argument misses the point. Excusing Bedford, by reason of GSA's delay, from having to make renovations justifies treating the alterations as having been performed according to schedule.[9] It does not justify treating the renovation requirement as never having been part of the contract.
 
 
 40
 Accordingly, the judgment should be modified to increase by $81,485 the amount of restitution to which the government is entitled from Bedford.
 
 C. The Request for Restitution from Bowery
 
 41
 As to the $2,195,779 that the district court found the government had overpaid in rent and utilities between June 1980 and September 1981 the government seeks here, as it did below, to have restitution not only from Bedford but from Bowery. The district court denied this relief because it concluded that Bowery had not been unjustly enriched by the receipt of payments from the government. We decline to disturb this ruling.
 
 
 42
 Restitution is an equitable remedy that may be granted, in the sound discretion of the court, to prevent one party, at the expense of another, from retaining a benefit to which he is not entitled. Atlantic Coast Line Railroad v. Florida, supra; see Restatement of Restitution § 1 comments a-c. It is well established that the court has discretion to deny a plaintiff restitution of an unrequired payment to a defendant, where the defendant has received the payment in good faith and used it in satisfaction of the debt of a third person to the defendant. E.g., Equilease Corp. v. Hentz, 634 F.2d 850, 853 (5th Cir.1981). Thus, "[i]n situations of endless variety, courts have denied restitution because money paid by one party was received in good faith by the other, in satisfaction of or as security for a valid claim against a third person." 3 G. Palmer, supra, § 16.6, at 490-91 (footnotes omitted).
 
 
 43
 In the present case, the party that was unjustly enriched by the government's overpayments between June 1980 and November 1981 was Bedford, not Bowery. In that period, during which Bedford's debt to Bowery stood at approximately $10.2 million in principal amount, Bowery received $6,242,261 in rent from the government for Bedford's account. Thus, Bowery has hardly been enriched, having received less than it was entitled to receive from Bedford. Compare Strubbe v. Sonnenschein, 299 F.2d 185, 192 (2d Cir.1962) ("To the extent ... that [A 's] payment to [C ] exceeded the amount justly due [C ] from [B ], it would be inequitable to permit its retention."). Nor, indeed, did Bowery retain all the sums received. Rather, it used $1,047,218 to pay the building's operating costs and $2,145,487 to pay the building's real estate taxes and water and sewer charges. Bowery was able to retain--to reduce the interest on Bedford's loan--only $3,215,091. This amount not only was less than the amount of Bedford's debt to Bowery; it also was less than the amount the government was required to pay Bedford.
 
 
 44
 Accordingly, we see no reason to disturb the district court's refusal to require Bowery, along with Bedford, to make restitution to the government, because "it is evident that Bowery did not benefit unjustly from the government's overpayments." 548 F.Supp. at 736.
 
 D. Benefit-of-the-Bargain Damages
 
 45
 The government contends that in addition to recouping its past overpayments, it was entitled to an award of damages representing the loss of the future value of its bargain with Bedford. Thus, it urged the district court to award it the difference between $2,902,160 per year, the contractual rental, and whatever amount the court determined to be the fair rental value of the building on December 14, 1981, the date as of which the government elected to "take" a leasehold interest. The district court found that the date on which Bedford had breached the lease agreement was December 13, 1978; that the government had repeatedly represented the rental value of the building as of November 1, 1978, to be no greater than the amount of rental provided for by the lease agreement; and that there was no difference, therefore, between the rental value of the premises on December 13, 1978, and the rent the government was to have paid pursuant to the lease agreement. Hence the court held that the government was entitled only to nominal damages of $1.00. The government challenges this ruling on the grounds that the principle of "judicial estoppel" should not have been applied against it. We conclude that, whether or not the principle (a) is recognized in this Circuit, see Stella v. Graham-Paige Motors Corp., 259 F.2d 476, 481-82 (2d Cir.1958); Bertha Building Corp. v. National Theatres Corp., 248 F.2d 833, 836 (2d Cir.1957); id. at 837 (L. Hand, J., dissenting); Gottesman v. General Motors Corp., 222 F.Supp. 342 (S.D.N.Y.1963), or (b) was properly applied in this case, compare Davis v. Wakelee, 156 U.S. 680, 689, 15 S.Ct. 555, 558, 39 L.Ed. 578 (1895), with, e.g., United Virginia Bank/Seaboard National v. B.F. Saul Real Estate Investment Trust, 641 F.2d 185, 189-90 (4th Cir.1981), the court's fixing of the building's December 13, 1978 fair annual rent at $2,902,160 per year was entirely appropriate, because the government unquestionably failed to carry its burden of proving a higher valuation.
 
 
 46
 Throughout the earlier stages of the litigation the government had, as the district court observed, steadfastly maintained that the fair annual rent of the building in late 1978 was the same as the rental specified in the lease agreement.[10] For example, before the 1980 trial, the government answered an interrogatory propounded by Bedford, as follows:
 
 
 47
 It is the position of the United States that the most accurate standard for determining the "market rent" for a particular piece of real property is the actual rental terms agreed to between a willing lessor and a willing lessee for that particular property, after due consideration of all relevant facts and circumstances. Accordingly, the "market rent" for the premises between 1963 and the present is the actual rental rate agreed to in the 1962 lease and the actual rental rate agreed to in the Solicitation and the offer of the defendants, as amended.
 
 
 48
 (United States' Answers to First Set of Bedford Interrogatories No. 12, dated June 18, 1979.) The government subsequently submitted the following proposed findings of fact:
 
 
 49
 63. The fair annual rent for the premises as of the relevant date is the amount of rent set forth in Bedford's offer, as amended, and accepted by the United States by letter dated October 30, 1978....
 
 
 50
 64. In the alternative, the fair annual rent for the premises, as of the relevant date, is $2,900,000,
 
 
 51
 both prior to the 1980 trial (Consent Pre-Trial Order dated Mar. 17, 1980), and after that trial (United States' Proposed Post-Trial Findings of Fact dated Apr. 25, 1980). Whether or not these assertions sufficed for an invocation of judicial estoppel, they plainly constituted admissions, see, e.g., Bertha Building Corp. v. National Theatres Corp., supra, 248 F.2d at 836; id. at 837 (L. Hand, J., dissenting), and hence were evidence from which the court could fix the fair annual rent as of December 13, 1978, at $2,902,160. Indeed, at the damages trial, the government presented no evidence from which the trial court could reach any other conclusion.[11]
 
 
 52
 The government argues that it presented no such evidence at the 1981 trial because it relied on a prior finding of the district court, made after the 1980 trial, that the fair market rental value of the building as of November 1, 1978, was $3,280,200. We find this argument unpersuasive since we cannot conclude that this figure was apposite to the damages issue before the court at the 1981 trial. While the basis for the court's prior finding of a fair market rental value of $3,280,200 was not entirely clear, see 491 F.Supp. at 869, two factors suggest that that valuation did not assume that the government was to be the sole occupant of the building. First, the earlier finding was apparently made pursuant to the requirement of 28 U.S.C. § 2409a(b) that "just compensation" be paid, see 491 F.Supp. at 868; the "just compensation" standard requires the assumption of the highest and best use of the building, see, e.g., Olson v. United States, 292 U.S. 246, 256, 54 S.Ct. 704, 709, 78 L.Ed. 1236 (1934), which is multi-tenant occupancy, see 548 F.Supp. at 743. Second, the appraisal introduced by the government at the first trial concluded that the fair rental value of the property was $3,250,000 on a multi-tenant basis, but only $2,900,000 "[s]hould the United States Government continue in occupancy." (Government Exhibit 560, at 31; see also Post Trial Memorandum of United States dated Jan. 29, 1982, at 13 n.*.)
 
 
 53
 The burden of proving damages was on the government. Its reliance on the prior ruling of the district court on a noncomparable issue hardly sufficed to satisfy its obligation to prove that the fair annual rent of the building as of the date of breach exceeded the rental required by the lease agreement, especially in light of the government's admissions to the contrary. Accordingly, we uphold the trial court's decision to award the government only nominal damages.
 
 
 54
 E. The Government's Obligation To Pay Fair Rental Value Prior to Foreclosure
 
 
 55
 The district court ordered the government to pay Bowery rent based on the fair market rental value of the building dating back to December 14, 1981, the date as of which the government elected to condemn a leasehold interest in the building. The government contends that this order was premature and that it cannot be compelled to pay fair market rental value until such time as Bedford has lost ownership of the building through a foreclosure sale. This argument, premised on the state-law principle that a receiver in a foreclosure action is not entitled to collect from a tenant more rent than the mortgagor-landlord could collect, simply ignores our ruling in Bedford II.
 
 
 56
 In Bedford II we ruled that the government was not entitled to specific performance of the lease agreement.[12] We observed that under principles applicable to private suitors, the government would thus have no right to remain a tenant, although as the sovereign it had the power to elect to remain in possession--provided that it pay "just compensation" as determined by the district court. We concluded, in part, as follows:
 
 
 57
 Because we have concluded that the government is not entitled to specific performance of its lease, our decision is "adverse" to its possessory interest. Under § 2409a(b), the government will have sixty days from the issuance of our mandate on this appeal, which we take to be the "final determination" referred to in the statute, in which to make its election either to vacate the premises or to condemn some interest in them.
 
 
 58
 In the event that the government elects to condemn an interest in the premises, we think it plain that just compensation for the taking so accomplished must be determined as of the date of the government's statutory election.... [A]ny taking of an interest in 120 Church Street can occur only after the government has abandoned its insistence upon its contractual right to occupy the building, as it must after our rejection of its claim for specific performance, and asserts a right to occupancy based upon its prerogatives as sovereign.
 
 
 59
 Thus, the government's contention that although it made its election to "take" as of December 14, 1981, it is not yet required to pay just compensation is foreclosed by Bedford II.
 
 CONCLUSION
 
 60
 The judgment of the district court should be modified to allow the government (1) to recover from Bowery the amount by which its utilities payments to Bowery for March, April, and May, 1980, exceeded $14,000 per month, and (2) to recover an additional $81,485 from Bedford. In all other respects, the judgments and orders of the district court are affirmed. No costs.
 
 
 
 [1]
 Bedford Associates, a partnership consisting of the defendants Doris K. Carver and Samuel Ades, owns the building at 120 Church Street which is the focus of these actions. The building is operated and maintained by the defendant Amcar Management Corp
 
 
 [2]
 The government did not take the position that it should not pay rent. See Bedford I, 618 F.2d at 918
 
 
 [3]
 Stressing the statutory procedures governing the government's leasing of property, including the requirement that proposed leases requiring an annual rental of more than $500,000 be submitted to Congress for its approval, we concluded that these requirements could not be circumvented simply by a prospective lessor's statements that it would not be bound, while it repeatedly extended the life of its offers. See 657 F.2d at 1309-10
 
 
 [4]
 We stated as follows:
 Nonetheless, we affirm the judgment of the district court insofar as it denied specific performance to the government. Specific performance is an equitable remedy, committed to the district court's sound discretion. As an equitable remedy, it may be denied to a party whose own conduct is inequitable. [Citation omitted.] This is so even though the plaintiff's conduct was not so egregious as to constitute a defense in law.... In light of the district court's conclusion that the contract was unconscionable, and particularly in light of its specific findings that GSA sometimes dealt with Bedford in bad faith, we have no doubt that the court would have declined to order specific performance of the new lease even if it had taken the view of the applicable law set forth above. Had the district court done so, it would have been well within its discretion. Because no useful purpose would be served by remanding the matter to the district court for the exercise of its discretion,[14] we reverse the judgment insofar as it dismissed the government's action for damages, and we affirm it insofar as it denied specific performance.
 
 
 [14]
 At oral argument, the government appeared to concede that it would not be necessary to remand for the exercise of the district court's discretion on the matter of remedy.
 657 F.2d at 1314 & n. 14.
 
 
 [5]
 The court also allowed Bedford credit for amounts by which the government's rent payments, during the period November 1978 to May 1980, were less than $241,847 per month. 548 F.Supp. at 737; see Bedford I, 618 F.2d at 911
 
 
 [6]
 For example, the time charge records of one of Bowery's attorneys include the following entry for April 1, 1980: "BSB v. CARVER DK ET AL, ... off/Conf. Mr. Hawkins re Bank's acceptance of excess electricity payment...."
 
 
 [7]
 The court stated that
 there is no dispute that GSA's delay caused the commencement of renovations to be postponed until a time when construction costs had skyrocketed and performance would have been economically devastating to Bedford. 491 F.Supp. at 856, 864. Thus, the rent which should have been paid by the government was $241,846.66 per month from the date of commencement of the lease, November 1, 1978.
 
 
 [548]
 F.Supp. at 737
 
 
 [8]
 In a letter that we found formed part of the lease agreement, see Bedford II, 657 F.2d at 1311, Bedford stated that "[i]t is our anticipation that a number of floors will be completely renovated in advance of the November 1st, 1978 commencement date of the new lease," and provided that "[a]ny floors not completed at that date" would be rented at the $185,516 per month rate
 
 
 [9]
 Our ruling on this point disposes of the government's contention that it was entitled to liquidated damages on account of Bedford's failure to renovate
 
 
 [10]
 The government argues that its position at the 1981 trial was not inconsistent with these earlier representations because "[o]n remand it introduced no evidence of the value of the premises as of November 1, 1978." (Brief of United States on appeal at 31; emphasis in original.) While this fact may assist the government in arguing against estoppel, it rather detracts from any supposition that, as to damages, the government satisfied its burden of proof
 
 
 [11]
 The government concentrated its energies on arguing that damages should be calculated as if the breach had occurred on December 14, 1981, the date of the government's "taking." The district court properly rejected this contention
 
 
 [12]
 This ruling also foreclosed the government's effort to circumvent the fact that Bedford's breach occurred in 1978 by arguing that in 1981 Bedford forced the government to make an election and thereupon breached the government's "covenant of quiet enjoyment." In fact the government was forced to make an election not because of action by Bedford, but because Bedford II ruled that the government was not entitled to specific performance of the lease agreement. The denial of specific performance was, of course, exclusively attributable to the prior inequitable conduct of GSA